(No. 38979.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSE ROMERO, Plaintiff in Error.

*Opinion filed January 19, 1967.*

WARD, J., took no part.

EDWARD H. FIELDER, JR., of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and E. JAMES GILDEA, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

A jury found the defendant, Jose Romero, guilty of an unlawful sale of heroin, and he was sentenced to imprisonment for a period of not less than ten nor more than twenty years. On this writ of error he contests the validity of his conviction primarily on the grounds that an incriminating admission was allowed into evidence in violation of his constitutional rights, that his appointed attorney was incompetent, that he was entrapped into committing the offense, that inflammatory and prejudicial arguments were made by the prosecution, and that a prosecution witness was permitted, over objection, to remain in the courtroom to assist the prosecutors in the trial of the case.

Summarized, the record shows that during the afternoon of January 9, 1963, Theodore Hall, a narcotics addict and informer, participated in a "controlled sale" of narcotics under the supervision of several Chicago police officers, who had provided him with $25 in marked bills. The officers and Hall went to the neighborhood of a poolroom where Hall expected to find the defendant. Hall testified that he told the defendant that he "had been there previously looking for him" and that he "had $25." The defendant took the money and told Hall to wait in a nearby restaurant. No one else was present at this time. After about an hour, the defendant returned, and outside the restaurant handed Hall a tinfoil package. Hall then combed his hair, a prearranged signal for the officers to arrest.

Officer Rouzan testified he saw the defendant and Hall meet outside the poolroom and proceed to the restaurant, where Hall waited until the defendant returned. When he saw Hall comb his hair, Rouzan approached and Hall handed him a tinfoil package. Rouzan and another officer, who had been waiting in a police car, arrested the defendant and brought him to the car. There were three other officers in the car at that time. Rouzan testified that he told the defendant he was under arrest, then opened the tinfoil package and saw some brown powder. He said, "This

brown powder, there isn't a lot here. What happened to the rest?" The defendant shrugged his shoulders and after a while said: "I sold the stuff but I don't sell for a living, I run." Asked why there was so little powder in the tinfoil, the defendant said: "I took it home and took a taste for myself." He told the officers that he obtained the powder from a man named Columbo, and he directed and accompanied the officers while they drove through the area in search of Columbo.

The defendant testified that in February of 1962 his small store had been burglarized while he was in New York to buy merchandise, and during the ensuing police investigation he disclosed the fact that he had previously been convicted of selling narcotics. Thereafter he was "badgered" by the police in an attempt to get him to tell his sources of supply. Two or three weeks before his arrest, police officers, including some who participated in the transaction here involved, broke into his rooms early one morning in an apparently wanton search for narcotics. He had been charged with possession of burglar tools and had spent several weeks in jail on a charge of car theft. Both of these charges were subsequently dismissed. He testified that he had previously taken police money from Hall to buy narcotics, but instead had purchased and used them himself. The principal theory of the defense was that the police harassment culminated in the present case which was contrived to "frame" him. He denied that Hall had given him any money on this occasion, and testified that Hall had given the money to one Morreales, that the defendant told Morreales that Hall was a stool pigeon and that the defendant and Morreales got narcotics and used them all. He denied that he had delivered narcotics to Hall. The defendant also testified that he had asked for continuances of his preliminary hearing because the police told him that they "had nothing with" him and that they would let him go if he would identify his sources of narcotics. His wife also

testified to police efforts to induce her to help her husband by identifying sources of supply. There was testimony that between one and two hours before he made the statement to the officers, the defendant had taken "half a spoon" of heroin, but on cross examination the defendant insisted that he knew what he was saying when talking to the police at the time of his arrest.

The defendant's contention that his constitutional rights were violated because he was not warned of his right to counsel before he made his statement to the officers at the time of his arrest has been abandoned in view of the decision of the Supreme Court of the United States in *Johnson* v. *New Jersey*, 384 U.S. 719. (*People* v. *Goodpaster*, 35 Ill.2d 478; *People* v. *Rue*, 35 Ill.2d 234.) The defendant now asserts, however, that his statement should have been excluded because it was involuntary. There was no objection to the statement on this ground in the trial court. We do not agree with the defendant that the prior incidents of police harassment to which he testified were sufficient to induce an involuntary confession, and there is no suggestion that the defendant was subjected to any improper police methods at the time of his arrest or that he was at that time promised leniency in exchange for an admission of guilt. His own testimony indicates that the voluntariness of his statement was not affected by the narcotics which he had taken before his arrest. We hold, therefore, that the statement was properly admitted in evidence.

We turn next to the contention that certain arguments of the prosecution were not founded on the evidence and were so inflammatory and prejudicial as to deny the defendant a fair trial. The prosecutor argued to the jury that the defendant said he "had to make a trip to New York to buy clothes for his business. It doesn't take a Philadelphia lawyer to figure out why he went to New York. He didn't go there for clothes. He went there for narcotics. That is where he gets it." The defendant objected, and the jury

was instructed to disregard the statement although a motion for a mistrial was denied. The prosecutor also argued, "Not long ago you heard about big men being shot. One was stopped by a bullet." An objection was sustained and the jury was instructed to disregard. The prosecutor continued: "Ladies and gentlemen of the jury, I am sure you read the papers and hear the news. You know the facts about who was shot and what his reputation was." And later, referring to the informer, Theodore Hall, the prosecutor said, "Perhaps through his efforts we will be able to get more big fellows." In his observations at the time sentence was imposed, however, the trial judge referred to the defendant as "at the very bottom of the ladder in the sale of narcotics".

The prosecutor also stated: "The defendant would start anybody on narcotics to get it for himself. It is obvious he started Miss Fisher on narcotics, his girl friend." The only testimony on this subject was that Miss Fisher's sister had started her on narcotics when she came out of the hospital and was in pain. With respect to Miss Fisher, the prosecutor said, "I am not going to say she is wrong, I am not judging her, but if anyone has any religion or social mores, we live in a society which does not permit common law." He continued: "We take pride we are Americans. We are from the United States. We join in the legal, the Bill of Rights. * * * Are we going to say the law is not right, we wouldn't enforce them, that we should condone people living together, not married?" "Go to church. Why go to church? Why make laws if laws are all wrong?" "But remember his girl friend. He didn't respect her enough to marry; his child, he didn't respect enough to give his name. He started her on it. He started her on it. Is that the kind of friend you would want?"

The apparent effort to depict the defendant as a "big fellow" in the distribution of narcotics by the unsupported statement that he went to New York to get his narcotics, the repeated charge, unfounded in the evidence, that the

320

defendant had started Miss Fisher on the use of narcotics, the repeated emphasis on the fact that the defendant and Miss Fisher were not married, and the thinly veiled appeal to prejudice because the defendant was a Puerto Rican—all these combined, in our opinion, to deprive the defendant of a fair trial. Not all of the improper remarks were objected to, but we have often held, both in civil and criminal cases, that if "prejudicial arguments are made without objection of counsel or interference of the trial court to the extent that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration, then upon review this court may consider such assignments of error, even though no objection was made and no ruling made or preserved in the trial court." *Belfield* v. *Coop,* 8 Ill.2d 293, 313; *Underwood* v. *Pennsylvania Railroad Co.* 34 Ill.2d 367, 371; *People* v. *Morgan,* 20 Ill.2d 437, 441; *People* v. *Moore,* 9 Ill.2d 224, 232.

Other alleged errors are unlikely to recur. The judgment of the circuit court of Cook County is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.