THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICK T. MACKINS *et al.*, Defendants-Appellants.

(No. 57828;

First District (1st Division)—January 7, 1974.

*Rehearing denied February 5, 1974.*

26

Julius Lucius Echeles and Carolyn Jaffee, both of Chicago, for appellant Rick T. Mackins.

James J. Doherty, Public Defender, of Chicago (James M. Sammons, Assistant Public Defender, of counsel), for appellant Harvie Morrow.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, Mariann Twist, and Barry R. Elden, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Defendants Harvie Morrow and Rick Mackins were jointly indicted and tried for attempt rape (Ill. Rev. Stat. 1969, ch. 38, par. 8—4) and murder (Ill. Rev. Stat. 1969, ch. 38, par. 9—1.) After a jury trial, each was found guilty of both offenses. Consecutive penitentiary sentences were imposed upon Morrow of nine to 14 years for attempt rape and 50 to 150 years for murder; and upon Mackins of six to 12 years for attempt rape and 30 to 75 years for murder. Represented by separate counsel, both have appealed.

The contentions raised by both defendants are:

1. In each instance, the evidence was not sufficient to prove guilt beyond a reasonable doubt. In this particular, defendant Mackins urges that his guilt on the theory of accountability rests entirely on speculation.

2. The original arrest of defendants was unlawful and they did not give valid consent to seizure of their clothing by the police so that their fourth amendment rights were violated.

3. The trial court erred in receiving expert testimony on the significance of certain evidence.

4. The trial court erred in admonitions to the jury regarding the testimony of a defense witness.

5. The trial court erred in permitting the jury to hear evidence regarding results of a lie detector test upon another suspect.

6. The trial court erred in receiving hearsay evidence.

7. The trial court erred in permitting evidence linking the advice of a State's Attorney with the bringing of murder charges.

8. The trial court erred in instructing the jury on the theory of accountability.

9. Conviction of defendants was unfair because based upon prejudicial argument by the prosecution to the jury.

10. Defendants were improperly sentenced to consecutive sentences for two offenses arising out of the same conduct.

The deceased was a young girl some 17 years of age. On Sunday, August 22, 1971, she was visiting a young lady friend who lived on the south side of West 47th Street shortly east of Racine Avenue in Chicago. This friend testified that the deceased left her home at approximately 11:30 P.M. or a quarter to 12 that evening. The deceased lived some distance west of the friend's home. The friend advised her to take a bus and gave her 45¢ for her fare. The friend walked her to the front gate where they parted, with the deceased walking west on 47th Street and about to cross to the north side of the street.

The body of the deceased was found about 5:20 A.M. in the vicinity

of the northeast corner of 47th Street and Racine Avenue. The lower part of the body was nude. The legs were completely spread apart. A sanitary napkin had been removed and was found a short distance away. She had been wearing an undergarment of panties and jeans with the leg portion removed. Both of these articles were found close to the body. Her bus fare of 45¢ was found near her hand. There are railroad tracks in this vicinity and the body was found adjacent to a small shack. The ground in that area might be described as dirt with particles of stone or rock intermingled. An automobile could enter this area if it were driven to the right of the body.

Pathological examination showed that the victim died from manual strangulation which had caused her death from asphyxiation. The examining physician found that the back portion of the body was covered with dirt. There were five scratch marks on the skin of her neck. In the opinion of the doctor, these marks had been caused by fingernails. There were an abrasion of the chin, a black and blue bruise inside the left thigh and a fracture of the larynx. A vaginal swab did not show sperm. In the opinion of the doctor, the deceased came to her death some time before midnight.

At approximately 12:45 on the morning of Monday, August 23, 1971, two police officers were driving an unmarked automobile in the area of 43rd and Laflin Streets for investigation of burglaries. They observed an automobile occupied by two men parked at the curb without lights. This was about one half mile from the scene of the murder. The officers turned their headlights on the car and it sped away, westbound. The car then halted for a traffic light at 43rd Street and Ashland Avenue about one block away. The officers stopped behind it and approached. They identified the occupants of the car as the defendants. Morrow was driving and Mackins was a passenger.

One of the officers testified that when he announced his office, defendant Morrow, "gave me a look of fear that I never seen before." The officers told these men to stay where they were. Instead, the car sped away westbound through the red light. The officers pursued again and overtook the automobile. Defendants were placed under arrest. Police observed fresh bleeding scratches on Morrow's face, dirt upon his face and clothes and the fact that he was not wearing shoes. They noted also that both men had been drinking. In their report, the officer characterized Morrow's condition as the lowest on a scale of various stages of intoxication. Defendants were charged with minor offenses not relevant here. Their automobile was removed to the police pound. Sometime during the course of the next day, they made bond and were released. At that time, the arresting officers were unaware of the homicide.

A woman named Betty Bilben lived next door to the east on the same side of 47th Street as the friend the deceased had visited. About 11:30 on the evening in question, she was looking out of the open window at 47th Street. She noticed a black Buick automobile with a dent in the door on the driver's side and also a patch of gray paint on the back of the car where some work on the body had been done. There were two men in the car whom she could neither identify nor describe. She saw the automobile driven along close to the curb, first in a westerly direction and then it returned and drove by in an easterly direction, also close to the sidewalk. She also noted a bus driving west on 47th Street. She did not know if it was one which followed a route directly west on 47th Street or whether it would turn left or to the south on Racine Avenue which would be the next street to the west.

At about a quarter to 12 or ten minutes to 12, after she had first seen this automobile, she saw the deceased at the gate of the neighbor's house talking to her friend. She saw the deceased walk several houses to the west then cross over to the north side of 47th Street, then walk west and take a position on the northeast corner of 47th Street and Racine Avenue. At that time, she again saw the car with the two men which was then going east. This witness testified that a member of her family had been shot about a month before and she had been watching for people involved in this who had passed back and forth in front of their home.

Shortly thereafter, when commission of the murder became public knowledge, this witness called the police and told them what she had seen. Two officers took her to the police pound and drove her up and down between lanes of parked automobiles. After looking at some 25 or perhaps 50 cars, she identified the automobile in which defendants had been arrested as the same car that she had seen twice on the night of the murder. After this, the police told her that she should look at some of the other cars. They drove about and she looked at 100 or 150 additional automobiles and persisted in her identification of the same car.

A police investigation then ensued. The two defendants were contacted by the police and they voluntarily came to the station. Morrow was wearing the same clothes that he did upon the night in question. Police went to his home and obtained a change of clothing for him upon their request. He gave them the shirt and trousers that he had been wearing. Mackins was wearing the same trousers but a different shirt. Upon a telephone call to his mother from the police, she brought a pair of trousers and the shirt he had previously worn. Thus, the shirt and trousers of each defendant were voluntarily given into police custody. Prior to this time defendants had both been given proper *Miranda* warn-

ings. They also gave the police samples of their blood for analysis. In addition, samples of the dirt were taken from the area in the immediate vicinity of the body. Additional samples were taken of dirt and debris which had accumulated under the left front fender of the automobile.

A police microanalyst testified that the deceased had blood of type O, type M-N; Morrow's blood was type O-N; Mackins was type A-N. There is testimony that some 43% of the population have blood in various subdivisions of the "O" type. Human blood of type O was found on the panties of deceased but there was insufficient quantity to ascertain additional typing details. The palm of one hand of the deceased also bore traces of human blood classified as type O. There was no wound on this hand of the deceased.

The microanalyst described in detail how he had vacuumed all of the clothes concerned and then had made microscopic examinations of fibers adhering thereto. As a result, he testified that six nylon fibers were found on the cotton blouse of the deceased. In the opinion of the expert, these fibers and those comprising the trousers worn by Mackins were morphologically similar and identical with respect to their microscopic properties. In addition, seven cotton fibers of reddish cast were found on the trousers of Mackins, which were black, and upon his shirt. These red fibers were morphologically similar and identical in their microscopic properties to the fibers which comprised a cotton blouse of deceased. The expert described this as a cross-match between these two different types of fibers which he had never seen before in hundreds of similiar examinations.

The expert also found that Morrow's blue denim trousers had eight cotton fibers which were morphologically similar and identical in microscopic properties to the cotton fibers comprising the blouse of deceased. The expert expressed the opinion that there was a strong probability of physical contact between these various articles of clothing although it was conceded that microscopic fibers of this type could possibly be airborne. The expert also found blood traces on the shirt and trousers of Mackins but could not type the blood as to whether it was human or not because of the limited quantity. The expert did find human blood on Morrow's shirt sleeve and also found human blood of type O on his trousers. There were traces of blood found under the fingernails of the deceased but limited quantity made further classification impossible.

An expert chemist called by the State testified that, in the dirt taken from the murder site and also in the material found adhering underneath the left fender of the automobile, layers of paint were found with gray, green and black layers in that order. These were very minute chips and the material of gray color could possibly be cement. The expert put these

particles from both sources to a solubility test and found them all similar. He then subjected both types of samples to a sophisticated machine called an emission spectrograph. This apparatus vaporizes a microscopic portion of the material by use of a laser beam and then takes a photograph of the resulting spectrum or color chart. The witness testified that he tested only both samples of the green paint in this manner. Tests of the black and gray layers would have been of doubtful value because paints of these colors generally have the same chemical composition. The expert found and concluded that both types of green paint vaporized to produce an identical spectrum so that, in his opinion, the particles of the green paint found at the site were chemically identical with the particles found under the left fender of the car. Other microscopic and chemical examination showed that these two green samples were quite similar.

Defendants had previously petitioned the court for a chemical expert to be supplied to them at State expense. Their expert testified that there was a morphological similarity between the fibers which composed the victim's blouse and those found on the clothing of Mackins. However, he reasoned that this type of fiber was fairly common and that since only fibers of various red shades had been found on the trousers worn by Mackins, the fact that there were also white fibers on the girl's blouse tended to lessen the probabilities that her blouse was the source of the fibers in question. This expert made a test of the paint chips upon a different type of scientific machine. In his opinion, the green paint chips were similar in character but he expressed the opinion that common use of paint of this color qualified the point of similarity. Analysis by his machine, however, did show a similarity between the two samples of green paint but he could not say that the two samples were identical as to chemical composition. However, this witness had never used the emission spectrograph with the laser beam. He expressed the conclusion to the jury that he found similarities in the samples and also differences so that the samples could or could not be from the same source.

Each defendant testified in his own behalf. Mackins consumed various cans of beer at several taverns during the afternoon in question and returned to his home about 5:00 or 5:30 P.M. He and Morrow each drank a fifth of wine. They then went to a chili parlor together where they had some chili. They drove to this place in Morrow's car. At that time, it was dark but Mackins did not recall the time. He testified that after leaving the chili parlor they went to a liquor store where each of them bought another fifth of wine. They parked Morrow's car on the south side of 33rd Street, in front of an apartment building where they both lived. He testified that a police squad car passed by and that Morrow jumped out

of the car from the driver's seat and ran toward the apartment building. He tripped and fell in the dirt at that point. He himself had stepped out of the car but both reentered.

Mackins also remembered that they then drove away in the car, some time during the night. At 22nd Street and Western Avenue they picked up a lady accompanied by three small children who was apparently waiting for a bus. They were holding newspapers over their heads to shield themselves from the rain. Mackins had a good recollection of this event, how he had first spoken to the lady; had invited her into the automobile and had pulled back his seat so that she and the children could enter. He knew that they had taken the lady and the children to their home in the area of 18th Street and Blue Island. He remembered that the lady had offered Morrow a dollar for his kindness which he had first refused and then accepted. He then stated that he fell sound asleep and had no recollection of anything until the police siren woke him up.

On cross-examination, Mackins conceded that he told the police he was sleeping from 11:00 P.M. until 1:00 A.M. the next morning. The arrest by these officers took place at approximately 12:45 A.M. He also told the police that he did not know how Morrow was scratched about the face and ear. Mackins' testimony was that he has bitten his nails off short for many years. This was corroborated by the testimony of his mother.

Morrow also testified to an afternoon of drinking. He was wearing brown hush puppies at that time. He and Mackins also drank a considerable amount of wine together. He fixed the time of their visit to the chili parlor together as about 9:30 P.M., after it was dark. He also had a fairly good recollection of picking up a woman and children in the automobile. He did not attempt to fix the time when this occurred. At one point he asked Mackins to drive the car but the latter refused. All that he remembered from and after this time was stopping at the red light and seeing flashing lights behind him. His next recollection was walking up the steps of the police station after he had been handcuffed. He did not recollect where he had lost his shoes or where his face and ear had been scratched. Police photographs show marked bruises or abrasions on both of his elbows and also upon one of his knees.

William Luzzader lived in the same building as Morrow and Mackins. He lived across the hall from Morrow on the third floor. He saw Morrow and Mackins seated in the former's automobile that evening in front of the apartment building at about 11:30 or 11:45 P.M. He said that Morrow and Mackins "were sitting there, standing out in front, while they was coming up to the curb" and Morrow fell in the dirt with a bottle of wine in his hand and broke it. He could not see if Morrow was injured.

Mackins asked Morrow "how come he broke the bottle." He saw both men then get into Morrow's car and leave. The witness observed this from his third story window.

Yolanda Garcia testified that she saw Morrow and Mackins seated in the former's automobile parked on the north side of 33rd Street. She observed them from time to time from 11:30 P.M. until 12:30 A.M. She noted that it rained hard about 12:00 or 12:15. She told no one about this until approximately two weeks before her testimony which took place March 6, 1972, about six months after commission of the crime.

■■ It appears from the above summary that the case against both defendants rests upon circumstantial, as distinguished from direct evidence. The basic legal principles regarding the nature and effect of this type of evidence have been established and adhered to for many years. Actually, "* * * there is no legal distinction between direct and circumstantial evidence as to the weight and effect thereof." (*People v. Robinson,* 14 Ill.2d 325, 331, 153 N.E.2d 65, and cases therein cited.) It is correct, as counsel for defendants urge, that "[w]here the only evidence in a prosecution for homicide is circumstantial evidence the guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis." (*People v. Lewellen,* 43 Ill.2d 74, 78, 250 N.E.2d 651.) However, this precept should not be interpreted as requiring the prosecution to prove guilt "beyond any possibility of a doubt." *People v. Murdock,* 48 Ill.2d 362, 367, 368, 270 N.E.2d 21.

■■ The principle has often been stated that where the evidence of guilt is entirely circumstantial, it is "* * * necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." (*People v. Marino,* 44 Ill.2d 562, 580, 256 N.E.2d 770, and cases therein cited.) Application of these principles to the case at bar leads directly and convincingly to the conclusion that the guilt of both defendants has been proved beyond reasonable doubt.

We arrive at this result from an examination of the entire record and from a consideration of all of the evidence. The following is a seriatim statement of the combination of circumstances in this case which, collectively considered, have impelled the above conclusion:

1. There is credible and uncontradicted direct evidence placing Morrow's automobile in the immediate vicinity of the crime at or about the time thereof. Morrow and Mackins admitted that they were together in this automobile for many hours on the same evening until they were arrested by the police about one half mile from the scene of the crime. This strong evidence is fully corroborated by the next link in the chain.

2. Evidence of the identity of the green paint chips found at the site and those taken from beneath the left front fender of Morrow's car is of great significance. The correspondence of position of the three colors in both types of samples and the identity of the spectra resulting from vaporization of samples of the green paint by laser beam shows beyond reasonable doubt that Morrow's car was necessarily at one time in the exact area of the murder site.

3. When stopped by the police, a look of great fear on Morrow's face was noted. Precipitate flight to avoid the police may be explained on the ground of partial intoxication but might also be reasonably interpreted as an attempt to avoid arrest for a more serious crime.

4. There were fresh and bleeding scratches on Morrow's face and left ear at the time of the initial arrest. Mackins testified that he did not know the source of these scratches. Morrow gave no explanation.

5. In view of the absence of any other theory, the only reasonably permissible hypothesis for scratches of this type is that they were inflicted by the victim during the struggle. This is supported by the traces of type O blood found beneath her fingernails.

6. Similarly no explanation was given by defendants regarding the marked abrasions on both of Morrow's elbows and on his right knee which are clearly shown by police photographs. The most reasonable explanation of this fact is contact with stones appearing from photographs of the murder site.

7. Morrow's face had dirt upon it. There is an attempt to explain this by alluding to the fall on the parkway in the front of Morrow's home. A more credible and corroborated explanation is that this dirt came from the site of the crime.

8. Also, there was dirt found on Mackins' clothes which is entirely unexplained except for the fact that the dirt came from the murder site.

9. There were blood traces of type O on Morrow's shirt and pants and on Mackins' trousers. The victim had no wounds on her palm to cause the presence of blood beneath her fingernails so that all of these traces of blood are best explained as having come from the open scratches on Morrow's face.

10. The experts found fibers from the victim's blouse on Mackins' trousers and fibers from these same trousers on the victim's blouse. Both sets of fibers were described as morphologically similar and identical with respect to their microscopic properties with other fibers from each source. Similarly Morrow's blue denim trousers had adhering thereto eight fibers from the blouse of the deceased which were similarly described by the expert. Despite the argument in behalf of defendants that these microscopic fibers could be airborne, the fact remains that the

only logical explanation of this evidence, with particular reference to the cross-match, is physical contact between both defendants and the victim.

11. Morrow had no shoes when he was arrested. He gave no account of the loss of his shoes. It is true, however, that there is no credible evidence that the shoes later found at the site were actually his.

■■■ All of the above evidence is equally forceful in establishing the guilt of both defendants of attempt rape. Although proof of specific intent to commit rape is essential here, such intent may be inferred from the circumstances. (See *People v. Triplett*, 46 Ill.2d 109, 112, 263 N.E.2d 24, and cases there cited; also *People v. Hornbuckle*, 7 Ill.App.3d 328, 331-332, 287 N.E.2d 294.) Undoubtedly sexual factors constituted the motive for the assault upon this victim. This is evidenced beyond reasonable doubt by the removal of all of her clothes from the lower portion of her body, the position of the body upon the back with the legs outspread, the bruise found on the inside of the thigh below the groin area, and the removal of the sanitary napkin. Even the place chosen for the assault in a deserted area partly shielded by a small shack is consistent with a sexual motive. The theory expressed by defendants that after the victim was murdered by some unknown person, someone else, also unknown, with necrophiliac tendencies or with a curiosity concerning dead bodies had disturbed the fully clothed corpse, has no support in the record.

Additional significance flows from the testimony of both defendants and their alibi witnesses. The testimony of both defendants may well be attacked on the ground of lack of credibility. The testimony of Mackins is completely inconsistent with his statement to the police that he was sleeping in the automobile from 11:00 P.M. to 1:30 A.M. The jury was entitled to disbelieve his explanation in view of testimony that he told a different story when arrested. (See *People v. Morehead*, 45 Ill.2d 326, 330, 259 N.E.2d 8.) Also his testimony conflicts with that of at least one of the alibi witnesses who saw him completely wide awake at 11:30 or 11:45 P.M.

The identical factors operate in consideration of Morrow's testimony. He, too, remembers with a good degree of clarity the visit to the chili parlor and the incident with the unknown woman and her three children. His recollection dims only shortly before the initial arrest for traffic violation. Testimony of this type is not sufficient to create a reasonable doubt in view of the mass of circumstances above disclosed.

■■ The repeated testimony of both defendants concerning their indulgence in alcoholic liquor upon the date in question is of no assistance to them. The police reported that at the time of their initial arrest, the

degree of intoxication of Morrow was "unsure" which constitutes the first or lowest degree of intoxication on a scale of five progressive types of which the highest is "falling." The record shows that even this slight degree of intoxication was completely voluntary. It is the general rule in Illinois "that voluntary drunkenness is no excuse for the perpetration of a criminal act" and this condition "may be used to negate the essential elements of intent and malice only where the intoxication is so extreme as to suspend entirely the power of reason." (*People v. Hare*, 25 Ill.2d 321, 326, 185 N.E.2d 178.) In the case before us, the recollection of events displayed by both defendants does not show extreme intoxication. In fact, defendants never tendered an instruction on intoxication so that their counsel apparently realized that their condition furnished them with no defense. See IPI—Criminal, No. 24.02 at page 415 and Ill. Rev. Stat. 1971, ch. 38, par. 6—3.

William Luzzader testified that he saw the defendants standing in front of the apartment building at about 11:30 or 11:45 P.M. and saw Morrow fall to the dirt. He then saw them get into their automobile and drive away. He did not state whether the automobile was parked on the north or south side of 33rd Street. In any event, his testimony regarding the fall by Morrow does not comport with Morrow's own version of the fall. On the other hand, Yolanda Garcia stated that she saw the defendants on several occasions between 11:30 P.M. and 12:30 A.M. She saw them sitting in their automobile on the north side of 33rd Street and did not notice Morrow's fall. Morrow testified that he had no recollection whatsoever of being at this place at the time suggested by the two alibi witnesses. Mackins testified that he and Morrow were seated in the car in front of the apartment building but he placed the car on the south side of 33rd Street and fixed the time as being even before he and Morrow had taken the lady and the children in the latter's car, which should be several hours prior to the time fixed by the alibi witnesses.

Furthermore, the scientific evidence is of prime importance as proof of guilt. The expert opinion regarding comparison of paint samples and of microscopic fibers from the clothing of the parties is strong and convincing evidence of guilt beyond reasonable doubt. It is true that defendants' counsel made laudable and persistent efforts to attack this testimony by the opinion of another expert. However, the sole effect of these efforts was to raise a question regarding balancing of the opinions which was the function of the jury. We cannot say that the jury's preference for the opinions advanced by the experts called by the prosecution was unjustified nor that the evidence adduced by defendants in this regard was sufficient to raise a reasonable doubt of guilt.

"It was the function of the jury to make a determination of the

credibility of the alibi witnesses and of the weight to be given to the totality of the testimony. We cannot overturn the verdict of the jury simply because the evidence presented to it was conflicting." (*People v. Brown*, 52 Ill.2d 94, 105, 106, 285 N.E.2d 1.) When all of these factors are considered together, we must inevitably reach the conclusion that the verdicts of the jury are supported by strong evidence of guilt beyond reasonable doubt and to a moral certainty. We need hardly cite again the "axiomatic" rule that we may not substitute our judgment for that of the trier of fact except in cases where the evidence is so improbable or unreasonable as to raise a reasonable doubt of defendant's guilt. (*People v. Glover*, 49 Ill.2d 78, 84, 273 N.E.2d 367.) We will next consider the question of trial errors raised by both defendants.

In this regard, we will attempt to give both defendants the benefit of all contentions made by either of them. We will first consider the question as to the constitutional propriety of the arrest of defendants and the manner in which police obtained possession of the clothing they wore on the night the crime was committed. Although no pretrial motion to suppress physical evidence based upon alleged violation of fourth amendment rights was made (Ill. Rev. Stat. 1971, ch. 38, par. 114—12), we have examined the record to determine whether these contentions now advanced have merit as regards either defendant.

We have above detailed the facts leading to the initial and the subsequent arrests of defendants. These matters need not be repeated. Upon careful analysis thereof, we conclude that both arrests of these defendants were based upon probable cause; "\* \* \* upon the factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act." (*People v. Macias*, 39 Ill.2d 208, 213, 234 N.E.2d 783.) It is conceded that both defendants were given proper and complete *Miranda* warnings after their second arrest. The facts regarding surrender of the clothes worn by defendants on the night in question have already been stated.

■■ The point raised by defendants is that there cannot be a voluntary consent to seizure of their clothes and a subsequent search thereof unless the person surrendering these articles was first advised of his right to withhold such consent. Defendants cite and rely upon *Bustamonte v. Schneckloth* (9th cir. 1971), 448 F.2d 699, where the Court of Appeals applied the test that consent to search must be given "with knowledge that it could be withheld." This has never been the law of Illinois. (See *People v. Bradley*, 12 Ill.App.3d 783, 787, 299 N.E.2d 99, quoting from and relying upon *People v. Ledferd*, 38 Ill.2d 607, 610, 232 N.E.2d 684.) Also, *Bustamonte* was later reversed. Defendants concede in their reply brief that on appeal in *Schneckloth v. Bustamonte*, 93 S.Ct. 2041, the Su-

preme Court held that knowledge of the right to refuse consent could be a factor to consider in determining whether the consent was actually voluntary but such knowledge need not be established by the prosecution as an indispensable factor in effective consent. Applying this test to the case at bar, in view of the total lack of coercion or compulsion, either actual or constructive, the conclusion is manifest that the consent given by defendants was completely voluntary. There is nothing in this record even tending to indicate the contrary. See *People v. Brooks,* 51 Ill.2d 156, 167, 281 N.E.2d 326.

Defendants urge trial error on the theory that the court should not have received expert opinion evidence regarding the similarity of fibers found on the clothing of defendants and those.taken from clothes of the victim and also regarding similarity of paint chips found in the vicinity of the body to those taken from beneath the left front fender of the automobile used by defendants. The issue of general admissibility of expert testimony on these matters was not raised in the trial court. No objection was made to the competence of the expert testimony. (See *People v. McAdrian,* 52 Ill.2d 250, 253, 287 N.E.2d 688.) However, we will consider the merits of this point.

■ ■ The testimony of three experts was received; two tendered by the prosecution and one by defendants. Their testimony was concerned with matters entirely beyond the knowledge and experience of the ordinary person. It dealt with various difficult scientific observations made microscopically and with highly sophisticated and technical scientific instruments such as an emission spectrograph. Undoubtedly testimony of this type met the established legal requirement for its admissibility. Each of these witnesses possessed peculiar knowledge or experience not common to ordinary people, which would enable their opinions, founded thereon, to assist the court and jury in determining the issues. (*People v. Jennings,* 252 Ill. 534, 550, 96 N.E. 1077.) The *Jennings* opinion was written by the late Mr. Justice Carter in 1911 and is one of the early cases establishing the admission of fingerprint evidence. *Jennings* has been frequently cited by the reviewing courts of Illinois. See, for example, *People v. Stapelton,* 4 Ill.App.3d 477, 480, 281 N.E.2d 76.

Apparently counsel for defendants recognized this principle and used it to their own advantage. The trial court granted their motion for leave to retain an expert, at State expense. He examined the materials in question and, as above shown, testified as a defense witness. We find no error in admission of the scientific opinion evidence. Experts testified upon both sides and the acceptance or rejection of their respective opinions was a matter within the province of the jury. *People v. Oberlander,* 109 Ill.App.2d 469, 473, 474, 248 N.E.2d 805.

After the close of the People's case, the defense tendered Yolanda Garcia as an alibi witness. The theory of defendants was that she had seen them in front of the building where they lived at a time on the night in question which precluded them from being present at the scene of the crime. The State objected to the testimony of this witness on the ground that defendants did not timely file and serve notice of their intention to assert this defense. (Ill. Rev. Stat. 1971, ch. 38, par. 114—14 also Ill. Rev. Stat. 1971, ch. 110A, Rules 412, 413(d).) Prior to trial, and on October 8, 1971, the State had served notice upon defendants' counsel for such discovery.

The trial court interrogated the witness out of the presence of the jury and permitted all counsel to do the same. The court then denied the State's motion to exclude this witness and permitted her to testify. The court also permitted William Luzzader to testify as an alibi witness for defendants although his name was not disclosed in response to notice by the State. For this reason, *Wardius v. Oregon*, 37 L.Ed.2d 82, 93 S.Ct. 2208, cited by defendants, need not be considered here. This decision held unconstitutional a statute precluding introduction of alibi evidence by a defendant in the absence of prior notice thereof because the law failed to provide for reciprocal discovery of the State's witnesses. It may be that the Illinois statute is not subject to the infirmity pointed out in *Wardius*. (See *Williams v. Florida*, 399 U.S. 78, 26 L.Ed.2d 446, 90 S.Ct. 1893. See also, *People v. Fields*, 12 Ill.App.3d 608, 298 N.E.2d 743.) We need not consider this matter because the trial court did not apply the Illinois statute but permitted Mrs. Garcia and Mr. Luzzader to testify despite lack of notice.

When she testified before the jury as a witness for Morrow, Mrs. Garcia could not remember the month or the date upon which she had allegedly seen defendants in front of the house but testified that she could only "remember the hours." After a conference outside the presence of the jury, the court sustained the motion of the State to strike her testimony. The court then told the jury that the motion of the State to disregard all the testimony of the witness was granted and that it should be held for naught.

Counsel for Mackins then reopened this question in discussion with the court out of the presence of the jury. He urged that it was evident that the witness did actually have reference to the correct date of Sunday, August 22, 1971. He was granted an opportunity to speak to her in the presence of the State's Attorney. The court then held that the witness could be recalled. This ruling was made over the objection of the State's Attorney and out of the presence of the jury. The court then advised the jury that although the motion to disregard the testimony of

the witness was proper at that time, the court felt that the motion now made was proper "and therefore if Mr. Litwin or Mr. Rubin [trial counsel for Mackins] desire to call Yolanda Garcia to the stand we will hear her as your witness." Apparently the trial court directed the last few words to counsel personally. Defendants now urge that this conduct by the court was prejudicial. We disagree.

The original action by the court was proper. (Compare *People v. Handley*, 51 Ill.2d 229, 237, 282 N.E.2d 131.) Perhaps because of a language barrier the witness was somewhat confused, but the fact remains that, when she first testified before the jury, she did not know even the month to which her testimony pertained. However, the court was fair with the defense and permitted her subsequent testimony. The court had no alternative in doing this but to explain to the jury, as he did, that it was proper for the witness to be recalled. The record shows that none of the defense counsel took exception in any manner to the statements made by the trial court. None of them requested any other or additional explanation from the court. The record demonstrates that the testimony of this witness was completely and fairly placed before the jury. We find no prejudicial error resulting from this incident.

Defendants contend that the court erred in permitting the jury to consider evidence that another suspect for the same offense had "passed" a lie detector test. Determination of the merits of this claim requires a complete explanation. In an opening statement to the jury, counsel for defendant Morrow stated that the defense would prove that nine other suspects were investigated by the police before the defendants were charged with this crime. He stated that one person had been arrested at 3:00 A.M. on the morning in question hiding in the weeds a block or two from the scene of the crime.

The People called Richard Bedram, a Chicago Police Officer, to testify that he had carried certain objects of physical evidence to the crime laboratory which he identified before the jury. On cross-examination of this witness, counsel for defendant Morrow went outside the scope of the direct examination and asked the witness if he had ever questioned Mr. Hickey. This had reference to the person found near the scene. The witness stated, "Yes, I believe I took him downtown in the polygraph section." The cross-examiner then asked the witness if Hickey was a suspect in the case at that time and the witness answered affirmatively. No objection was made to this evidence by any person.

On redirect examination, the State's Attorney asked the witness again if Mr. Hickey was a suspect and the witness responded affirmatively. He then asked the witness, "After he had completed his, whatever he did at the polygraph section, was he still a suspect?" The witness answered,

"No, sir." Counsel for defendant Mackins made a general objection to this last question which the court overruled. Counsel for defendant Morrow then took up the cross-examination and asked the witness who was present in the polygraph section. The witness responded that the polygraph operator, whose name he did not recall, was present. Defense counsel then asked if the operator had put questions to Hickey and the witness responded, "Not in my presence." He then further testified that he had spoken to the polygraph officer before questions were put to the suspect but did not tell him the questions to be asked. Counsel for defendant Morrow then had the witness identify a police report concerning this polygraph examination and ascertained from the witness that five separate tests were given to Hickey by the operator, who was an employee of the police department. The State's Attorney then asked if the witness knew the results of the tests and, having obtained an affirmative answer, inquired as to what these results were. Counsel for defendant Morrow objected on the ground that only the examiner could testify to this. The court overruled the objection and stated that the door had been opened. The court also overruled an objection by counsel for Mackins who stated, "Not for Mackins, your Honor." The witness responded, "Negative."

The above examination of the record, page by page, reveals that the matter of Mr. Hickey as a suspect was first placed before the jury by counsel for defendant Morrow. The fact that Hickey had been taken for a polygraph test was again initially brought before the jury in cross-examination outside the scope of the direct. After that, the State's Attorney, by redirect examination, brought out only that Hickey was not a suspect after he left the polygraph section. Counsel for Morrow again broadened the scope of the inquiry by identification of the police report and by other questions concerning the number of tests given to Hickey. Sometime later in the trial, the State's Attorney proved that the clothes worn by Hickey were sent to the crime laboratory for examination. Expert testimony was then adduced to the effect that no sperm had been found on his trousers and no microscopic fibers matching those from the clothes of the victim had been found upon his articles of clothing. No objection to these matters was made by any person.

■■ It is manifestly clear from the above record that this entire issue regarding the evidence against Hickey as a suspect was brought into this case by defendant Morrow. Under these circumstances, the State's Attorney had no alternative other than to go forward with the evidence as he did. Morrow is not in position to object to matters which he himself caused to be placed before the jury. (*People v. Bell*, 53 Ill.2d 122, 127, 290 N.E.2d 214; *People v. Realmo*, 28 Ill.2d 510, 512, 192 N.E.2d 918.)

Once the matter was brought before the jury, fairness required a complete explanation.

In our opinion, the same principles should be applied to prevent defendant Mackins from taking advantage of this condition of the record. No objection was made by him to the opening statement of counsel for his codefendant nor did he make objection when counsel for the codefendant went outside the scope of the direct examination of the police officer to inject the polygraph examination into the record. Counsel for Mackins made objection to the attempt by the State's Attorney to prevent an unfair advantage by leaving open before the jury the exact status of the so-called suspect.

■■ In this particular phase of the proceeding, there was no conflict of interest between the codefendants. If there was a difference between the two attorneys as regards trial tactics, it was incumbent upon counsel for Mackins to register his objection before the issue was brought out to the jury. Once the matter had been placed before the jury without objection, justice required that the State be permitted to go further and bring out additional facts to put the whole matter in accurate perspective. On the other hand, if there were conflicting rights, it was the duty of counsel who thought these rights were abused immediately to register an objection and to obtain a ruling from the court. No party should be permitted to stand aloof or to "sit by", permit evidence to be received without objection and then to voice an attempted objection on appeal. (*People v. Killebrew*, 55 Ill.2d 337, 303 N.E.2d 377, quoting from *People v. Trefonas*, 9 Ill.2d 92, 98, 136 N.E.2d 817.) We cannot hold that this constituted prejudicial error as regards the defendant Mackins. To do so would open the door to the possibility of grave collusive abuses in any cases involving more than one defendant. We find no prejudicial error in this contention.

■■ On oral argument, counsel for defendant Morrow made a lengthy statement regarding the allegedly improper use of hearsay by the prosecution with reference to a pair of black shoes produced by them. This contention regarding these articles was neither advanced nor argued in the briefs of either defendant. Therefore, the point, even if it had validity, should be deemed waived by them. (Ill. Rev. Stat. 1971, ch. 110A, Rule 341 (e) (7); also, *People v. Adams*, 113 Ill.App.2d 276, 287, 252 N.E.2d 65.) Furthermore, neither defendant raised this point in their written motions for new trial which in itself constitutes another distinctive and equally strong basis for waiver. (Ill. Rev. Stat. 1971, ch. 38, par. 116—1 (c); also *People v. Nelson*, 41 Ill.2d 364, 366, 243 N.E.2d 225.) Despite this clear result, we will give full consideration to this point.

The testimony showed that defendant Morrow was not wearing shoes

when he was initially arrested by the police for a traffic violation. On direct examination by the State, Officer Thomas Ptak testified that he brought this matter to the attention of an Assistant State's Attorney. Accordingly, on September 22, 1971, the two of them went to the area where the body of the victim had been found. Officer Ptak testified that they spoke to a city worker at the site who told them that a pair of black shoes had been found there. They went to the place in question, identified as some 40 feet east of where the body was found, and found a pair of black shoes "in a semihidden state" under a pile of wood. At this point, at the request of the State's Attorney, the witness identified a pair of black shoes, referred to as People's Exhibit 54A and 54B, as being the shoes in question. The witness stated that the backs of these shoes were placed down so that "they were worn in a slipper fashion." No objection was made upon any ground to any of this evidence by any person.

On cross-examination of Officer Ptak, counsel for defendant Morrow broadened the scope of this matter. He asked the witness if he had ever taken the shoes back to Morrow's wife and had asked her if she recognized them. The witness responded affirmatively. He asked the witness if Mrs. Morrow told him that she did not recognize them. The witness replied negatively. Counsel then attempted to impeach the witness by reading a question and answer from a transcript of his testimony before the grand jury in which he allegedly stated that in the conversation Mrs. Morrow said that, "* * * she had no idea at all about his shoes she could not tell us anything." The witness responded that he could not recall this testimony.

As we would expect, the State's Attorney on redirect examination inquired about this conversation. Counsel for defendant Morrow objected on the ground that the conversation would be hearsay. Counsel for defendant Mackins made a general objection. The court overruled these objections and permitted the witness to testify that Mrs. Morrow told him that the defendant did have a pair of shoes like those but that, "* * * she hadn't seen those shoes for a couple of days." Defendant Morrow testified on direct examination that he was wearing "brown hush puppies" on the evening in question. He was given a pair of "house shoes" after his release from jail in connection with a traffic offense.

■■ Thereafter the matter of the shoes found at the crime site was brought before the jury again by counsel for defendant Morrow. On cross-examination of Timothy Zamb, a police microanalyst called by the State, defense counsel brought out that the shoes had been examined in the police laboratory and were found to be without any comparison linking them to the dirt or ground in question and without blood stains "or anything of that nature." Thereafter the shoes were offered in evidence

by the State and were received without any objection by either defendant. In closing argument, the State made mention of the shoes and of the fact that when Morrow was arrested he had no shoes on. This was described as a circumstance which was important in the proof of guilt. No objection to this argument was made by counsel for either defendant. No reference was made to the statement by Mrs. Morrow. This extra-judicial statement of Mrs. Morrow, as testified to by the officer, was out of court, not under oath and not subject to cross-examination. It was hearsay. (*People v. Carpenter*, 28 Ill.2d 116, 120, 121, 190 N.E.2d 738.) But, in view of the general and indecisive nature of the statement, and upon review of the entire record regarding this phase of the case, we cannot say that these sparse references to the shoes in question constituted reversible error.

Defendants urge prejudicial error in permitting the jury to hear testimony that murder charges were placed against the defendant on advice of an Assistant State's Attorney. This contention is negated by the record. On direct examination, a police officer testified that at one point Morrow was transported from the third police district to the ninth. The officer also testified that subsequently he had a conversation with an Assistant State's Attorney. When asked what he did then regarding defendant Morrow, he stated, "The State's Attorney advised us * * *." The balance of his response was cut off by an objection by defense counsel which the court sustained. The record then discloses the following:

> "Q. [By Assistant State's Attorney] Why was he transported from the third district to the ninth district?
>
> Mr. Sammons [Counsel for Morrow]: Object.
>
> A. To charge him with murder.
>
> Mr. Sammons: Withdraw the objection.
>
> Mr. Fitzgerald [Assistant State's Attorney]: Why would you have to transport him to the ninth district to charge him with murder?
>
> A. There is no lockup at the third district."

Counsel for Mackins, in contending that this was error, cited *People v. Blissitt*, 12 Ill.App.3d 551, 299 N.E.2d 562, which holds that it was improper to permit an Assistant State's Attorney to testify as a witness to a conversation with a police officer in which he recommended that murder charges be placed against the defendant. *Blissitt* has no application here. There is no such evidence before the jury. This was prevented by the prompt objection by defense counsel and the equally prompt and correct ruling by the court.

In addition, careful reading of all the evidence on this point shows

merely that the defendant was moved from one district to another simply because of the lack of a lockup. No objection of any kind was made to this showing by counsel for Mackins and the objection made by counsel for Morrow was expressly withdrawn. The point was thus waived by defendants. (*People v. Stanbeary*, 126 Ill.App.2d 244, 253, 261 N.E.2d 765; also *People v. Jones*, 47 Ill.2d 135, 140, 265 N.E.2d 125.) Also, this point is not raised in the written motions for new trial filed by either defendant. (See *People v. Nelson*, 41 Ill.2d 364, 366, 243 N.E.2d 225.) This contention of defendants must necessarily be rejected.

Defendant Mackins specially raises the point that he was prejudiced when the court instructed the jury on accountability over his objection. He suggests that there was no evidence that he was accountable, even assuming that defendant Morrow committed the offense. The court instructed the jury in the exact language of IPI-Criminal No. 5.03. This in turn closely parallels the language of the pertinent statute (Ill. Rev. Stat. 1971, ch. 38, par. 5—2.) The court also instructed the jury as to the issues in the crimes of murder and attempt rape as to each defendant. People's Instructions No. 15 and No. 16, IPI-Criminal No. 6.07 and People's Instructions No. 18 and No. 19, IPI-Criminal No. 7.02.

■■ Defendant relies upon authority such as *People v. Ramirez*, 93 Ill.App.2d 404, 236 N.E.2d 284. That case was differentiated by this court in *People v. Jones*, 11 Ill.App.3d 450, 454, 297 N.E.2d 178. We pointed out in *Jones* that in *Ramirez* "there was no proof that the defendant shared the criminal intent of the principal or that there was a *community of unlawful purpose*." (11 Ill.App.3d at 454.) We also held in *Jones* that "*  *  * proof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commission of an act by the group. (*People v. Richardson*, 32 Ill.2d 472, 476, 207 N.E.2d 478.) Proof that a person was present at the commission of a crime without disapproving or opposing it may be considered with other circumstances. (*People v. Hill*, 39 Ill.2d 125, 135, 233 N.E.2d 367.)" 11 Ill.App.3d at 454.

■■ The above review of the evidence shows that the two defendants were together for part of the afternoon and throughout the night until their arrest. The scientific evidence links the automobile which both occupied to the scene of the crime. The same type of evidence showing a cross-match of fibers proves that Mackins had some physical contact with the victim. This evidence was certainly sufficient as a basis for an instruction to the jury on the theory of accountability. Thus properly instructed, the matter of credibility and weight of the evidence was up to the jury and it was their duty to ascertain whether defendant Mackins

was innocent, whether he was a principal in commission of the crime or whether he was guilty on the theory of accountability. We find no error in the instructions.

■■■■ The last point raised by defendants is that they were denied a fair trial because of prejudicial argument by the prosecution. We find argued in the briefs some ten alleged points of prejudicial argument. We have carefully examined all of these arguments. We find that in eight of these instances no objection was made by either counsel to the allegedly improper argument. It is the general rule of procedure in Illinois that failure of counsel for defendant to object to improper final argument by the prosecution constitutes a waiver of the point. (*People v. Dailey,* 51 Ill.2d 239, 243, 282 N.E.2d 129; *People v. Hampton,* 44 Ill.2d 41, 46, 253 N.E.2d 385.) However, counsel for defendants urge that the arguments in question were so inflammatory and improper that we should consider them as constituting "plain error." Defendants rely upon cases such as *People v. Romero,* 36 Ill.2d 315, 223 N.E.2d 121. In *Romero,* the conviction was reversed because the arguments of the prosecutor included an appeal to prejudice against the defendant because of his place of birth and national origin and were so improper and prejudicial as to require reversal of the conviction. (See 36 Ill.2d at 318, 319, 320.) No such situation exists in the case at bar. None of these arguments, individually or collectively, requires such result.

As to the remaining two alleged errors, in one situation the prosecutor told the jury that there was "a cross-match" between fibers from the clothes of the victim found on the clothing of defendant Mackins and vice versa. We find no error in this regard. The phrase "cross-match" was the exact language used by the experts for the State and the defense. The remaining error that was objected to occurred when the prosecutor stated that people should be able to stand and wait for a bus "without two animals such as Morrow and Mackins coming along and killing them." This objection made by both defense counsel was overruled.

The tendency of reviewing courts in Illinois, based upon the correct proposition that the trial court has a superior opportunity to determine the propriety of final argument, is that these issues are generally left to the trial court absent a clear abuse of discretion. (*People v. Smothers,* 55 Ill.2d 172, 176, 302 N.E.2d 324.) It has been held "* * * impractical to lay definite guidelines for what may and what may not be said in arguments to a jury." (*People v. Gilmore,* 118 Ill.App.2d 100, 110, 254 N.E.2d 590, quoting from *People v. Wilson,* 116 Ill.App.2d 205, 253 N.E.2d 472.) Furthermore, the mere occurrence of improper remarks does not by itself constitute reversible error. There must be an additional element for this conclusion to be reached. If we cannot say that the assailed

argument constituted "a material factor in the conviction" (*People v. Clark*, 52 Ill.2d 374, 390, 288 N.E.2d 363); must have resulted in "substantial prejudice to the accused" (*People v. Nilsson*, 44 Ill.2d 244, 248, 255 N.E.2d 432) or that "the verdict would have been different had the improper closing argument not been made * * *" (*People v. Trice*, 127 Ill.App.2d 310, 319, 262 N.E.2d 276), then we must necessarily conclude that no prejudicial error resulted from the argument.

Upon this entire record we cannot believe that this single argument by itself was so significant as to constitute prejudicial error. See *People v. Mackey*, 30 Ill.2d 190, 193, 195 N.E.2d 636; *People v. Porter*, 11 Ill.2d 285, 294, 143 N.E.2d 250.

One additional comment, which has collective application to each and all of the above contentions made by defendants regarding trial errors, is applicable here. We have concluded that none of these errors was actually prejudicial. Even if it be assumed that one or more of these contentions have merit, "[I]t should not be and is not the policy of this court to reverse a judgment merely because error has been committed, unless it appears that real justice has been denied thereby or that the verdict of the jury or the judgment of the court may have resulted from such error." (*People v. Murphy*, 276 Ill. 304, 324, 114 N.E. 609.) The convictions appealed from should be affirmed.

■■■■ Defendants next urge the propriety of the consecutive sentences imposed by the trial court upon each of them for murder and for attempt rape. In our consideration of this contention, defendants are entitled to the benefit of the Illinois Unified Code of Corrections. Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1001 *et seq*. See *People v. Harvey*, 53 Ill.2d 585, 294 N.E.2d 269, and *People v. Chupich*, 53 Ill.2d 572, 295 N.E.2d 1.

When the defendants were sentenced, the law provided that consecutive terms could be imposed where the offenses "did not result from the same conduct." (Ill. Rev. Stat. 1971, ch. 38, par. 1—7(m).) The applicable statute now provides (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—4(a)):

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective."

We are impelled to construe the new enactment as a liberalization or amelioration of punishment and as a reduction of the area of permissibility of consecutive sentences. We accordingly modify the judgment appealed from by providing that, as regards both defendants, the sentences for attempt rape shall run concurrently with the sentences for murder.

In addition, the present statute provides punishment for various at-

48

tempts as regards murder, treason or aggravated kidnapping and "other forcible felony." In the latter category, the sentence for attempt shall not exceed the sentence for a Class 3 felony. (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 8—4(c).) We believe that rape comes within the definition of a "forcible felony" so that the possible range of sentences as to these defendants for attempt rape is from one to ten years in the penitentiary. (See Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—1(b) and (c). See also the supplemental opinion in *People v. Dudley*, 15 Ill.App.3d 18, 303 N.E.2d 24.) In this situation, the minimum term may not be greater than one third of the maximum set by the court. Both maximum sentences for attempt rape exceeded the permissible maximum. Therefore, each of the maximum sentences for attempt rape is reduced to ten years and the minimums are each reduce to one third of the maximum or three years and four months, to run concurrently with the sentences for murder which are both affirmed.

Judgments appealed from and sentences for murder affirmed. Sentences for attempt rape modified.

BURKE and HALLETT, JJ., concur.