THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LORENZO TURNER, Defendant-Appellant.

First District (1st Division) No. 60235

Opinion filed January 5, 1976.—Rehearing denied February 18, 1976.

552

554

Howard T. Savage, of Chicago (Patricia Unsinn, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Marcia B. Orr, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial Lorenzo Turner (defendant) was found guilty of aggravated kidnapping (Ill. Rev. Stat. 1973, ch. 38, par. 10—2) and intimidation (Ill. Rev. Stat. 1973, ch. 38, par. 12—6). He was sentenced to concurrent terms of 75 to 225 years upon the first conviction and 3 to 10 years upon the second. He appeals.

In this court, defendant contends that the trial court improperly denied his motion to quash his arrest and to suppress his subsequent confession; a complaint for search warrant and the warrant were improperly received in evidence during a hearing on this motion; admission into evidence of the results of the tracing of a telephone call without court order violated Federal law; the proof fails to show guilt beyond a reasonable doubt; it was error for the trial judge to allow counsel for defendant to participate directly in the voir dire examination of prospective jurors; the instructions were improper and conduct of the Assistant State's Attorney in cross-examination of the defendant and closing argument was improper and prejudicial.

The State contends that the trial court properly admitted defendant's oral and written confessions in evidence because the motion to quash the arrest was properly denied and the statements by defendant were free from any taint from that arrest; if admission of the confessions was error, it was harmless; evidence of the results of a telephone trace was properly received; the evidence proved defendant guilty beyond a reasonable doubt; regarding selection of the jury, defendant failed to preserve the issue for review and failed to show prejudice resulting from the trial court's action; the jury was properly instructed and the prose-

cutor's questions on cross-examination and comments on closing argument did not deny defendant a fair trial.

The evidence received by the court on the hearing of defendant's motion to quash his arrest and suppress his confession will be subsequently stated when we consider these issues. This opinion will commence with a summary of the pertinent evidence during the case in chief.

Allen Bernstein was last seen by his wife when she left their home about 8:30 a.m. on Friday, April 21, 1972. Mrs. Bernstein testified that when she left her husband was home and his Chevrolet automobile was in their garage. She returned at about 3 p.m. and found a message to call her husband; he and his automobile were gone. Their daughter told her that Bernstein had called and requested that she call him. The telephone number was that of a cleaning plant on 63rd Street in Chicago, previously owned by Bernstein and sold to defendant. Mrs. Bernstein had never seen or spoken to defendant before that date but she recognized the telephone number.

She expected her husband to return at 6 o'clock that night. When he did not do so, at about 7 p.m., she called the defendant's wife. She made other calls but was unable to locate her husband. About 11:30 p.m. Mrs. Bernstein received a telephone call from an unidentified man who told her that he had her husband and wanted $100,000. She heard her husband's voice in the background stating instructions about raising the money. During this conversation, Mrs. Bernstein wrote a note to her daughter to call the police. The caller told her that he would call at 10 a.m. the next day and that she was not to call the police. When she objected regarding the amount of money, he told her to get what she could. Police officers arrived and Mrs. Bernstein told them that in her opinion she had spoken on the telephone to two black males. The Federal Bureau of Investigation was also alerted.

Next morning Mrs. Bernstein received another telephone call from a person she described as a "black male" who inquired about the money. She told him that she had raised $33,000. Apparently he was satisfied and told her that she would get another call at 4 p.m. She asked if she could speak to her husband but was told this would be too difficult. At 4:15 p.m. she received another telephone call from a person with the same voice. He instructed her to go to the Clark gasoline station on 92nd Street and Stony Island Avenue. in Chicago, at 8 p.m. with the money. She was directed to make sure that no one followed her and she was to wait for a call in the telephone booth at the station.

Agents of the Federal Bureau of Investigation had Mrs. Bernstein wear a device so that they could hear everything she said. She followed

her telephone orders and, about 7:15 p.m. she drove from her home in Flossmoor to the designated telephone booth. There, she received a call at about 8:15 p.m. (April 22, 1972). The caller, with the same voice she had heard before, told her to leave the money by an incinerator and garbage can in the alley close to Harper Avenue and 88th Street and then to go home and await telephone instructions as to where to pick up her husband. She followed these orders. She had the money in $20 bills all dusted with fluorescent powder by Federal agents. She left it in the alley and then drove home.

Shortly after 9:30 p.m. she received a telephone call from the man with the same voice. He told her that he could not pick up the money because the place was surrounded by police. He directed her to go back, take the money and return to the Clark gas station. She did this and about 10:45 p.m. she received a call from the man with the same voice. He ordered her to wait 5 minutes, then drive around for 20 minutes and then go back to the phone booth. She did so and returned to the booth about 11:20 p.m.

Here she received another call from this person with the same voice. He instructed her to call another number which she did. For a time the line was busy but then her call was answered by the same person. He said he did not know where she could put the money. After further conversation, he told her that he would call her at 9 the next morning. She drove home but received no further communication.

Lena Breeland testified that she was employed at the cleaning plant operated by defendant at 1339 West 63rd Street, in Chicago. She was at work on Friday, April 21, 1972, from 8 a.m. to 6 p.m. Defendant came to the plant at about 1 or 1:30 p.m. and went upstairs to his office. Allen Bernstein arrived there about 3 or 3:30 p.m. He spoke briefly with another employee and then went to the back of the store toward defendant's office. She did not see Bernstein leave the plant that day and has never seen him since. She did not recall having seen the defendant that day after Mr. Bernstein had arrived until about 6:15 p.m. before she left work.

Claude Fields, then employed by defendant, first saw defendant that day between 2 and 2:30 p.m. at the cleaning plant. He later saw Bernstein arrive in an orange and white Chevrolet automobile. Bernstein went upstairs to defendant's office. Fifteen minutes later, Fields received a telephone call for Bernstein from a male Caucasian. He went upstairs to the defendant's office and knocked on the door. Defendant stepped out and Fields looked into the office and saw Bernstein there seated on a chair. Defendant told him that Bernstein did not want anyone to know that he was there. Fields accordingly went downstairs and told the caller

Bernstein was not at the plant. The witness saw defendant come downstairs and move Bernstein's car some 15 or 20 minutes before the plant closed. He did not see where defendant took the car and was not sure that he actually saw defendant enter the car or behind the wheel. He did not see Bernstein at any time thereafter. Some days later, when Fields learned about defendant's arrest, he spoke to his father and told him that he had seen Bernstein leave the plant. The witness also testified that defendant owned a German shepherd watchdog which stayed in the plant after closing time. Sometime before April 21 he had been introduced by defendant to an individual referred to as "Big Man."

The record shows participation in surveillance and investigation by agents of the Federal Bureau of Investigation working in cooperation with Chicago police officers. They had Mrs. Bernstein under audiovisual surveillance during the material times and at material places detailed in her testimony concerning her efforts to pay the ransom for return of her husband.

Eight Federal agents testified during the State's case. A detailed statement of their surveillance of the activities of Mrs. Bernstein and of defendant during the night would add unnecessarily to the length of this opinion. It is sufficient to summarize their evidence by stating that the testimony of the agents constituted a complete corroboration of the testimony of Mrs. Bernstein regarding her activities on the night of April 22, 1972, including the telephone calls she placed and certain of the things that she said during these calls. In addition, the testimony of these agents shows that defendant was observed in the vicinity of 88th Street between Harper Avenue and Stony Island Avenue starting at about 8 p.m. He was driving a dark colored 1965 Ford automobile with Illinois license number VB-2393. One of the rear taillights of his car had been broken by the agents for greater certainty in identification. Their evidence also showed their observation of Mrs. Bernstein entering the alley in which the ransom money was left and verified the presence of a package at a point near the incinerator.

The agents also saw the Ford automobile, driven by defendant, drive about in the vicinity of the entrance to the alley and actually drive into the alley. The agents also testified that about 10:47 p.m. defendant made a telephone call from a public booth in the vicinity of 87th and Dorchester Streets. At about 10:57 p.m. the agents observed defendant's car and Mrs. Bernstein's car pass each other, being driven in opposite directions, and they saw the Ford car make a U turn and follow Mrs. Bernstein's vehicle for a time. The agents also testified that between 11:35 and 11:45 the defendant made a telephone call from another public booth at 8524 South Stony Island Avenue. The number of this

telephone was 768-9527 which was the same number that Mrs. Bernstein had previously received directions to call.

On the morning of April 23, 1972, a Federal agent and a Chicago police officer saw the Ford car parked at defendant's cleaning plant on 63rd Street. They saw the same person who had previously driven the car make several trips from the car into the plant carrying clothing, plastic or paper. Later that same day, at about 1 p.m., another team of a Chicago police officer and a Federal agent followed the Ford car northbound. The car, driven by defendant, was stopped near 2350 South State Street, in Chicago, and defendant was arrested. Another car with a Chicago policeman and several Federal agents was present at the arrest.

A police officer of the city of Chicago testified that on April 23, 1972, he had followed the Ford automobile driven by defendant from 31st Street and the Dan Ryan Expressway to 22nd and State Streets. In the area of 2350 South State Street a squad car, containing a Chicago police lieutenant, Commander of Area 1, General Assignments, and several Federal agents, curbed the Ford and arrested the defendant who was driving. A search of defendant disclosed a .38-caliber, five-shot revolver in a holster worn under one arm. Defendant was also wearing an empty holster under his other arm and was carrying 10 rounds of ammunition.

Early Saturday morning, April 22, Federal agents observed Bernstein's Chevrolet automobile in a south side parking lot. That night the car was photographed and examined. No fingerprints were found except one, unsuitable for comparison, on the back of the steering wheel. In the opinion of a police technician, it was unusual to find only one print in an automobile. There were a number of small pieces of wet paper inside the car which could have been used to wipe the interior. Some red liquid was discovered in the wheel of a spare tire in the trunk.

Timothy Zamb, an expert microanalyst for the Chicago Police Department, testified that he analyzed this fluid and identified it as human blood, type "O". Bernstein's army identification tags listed his blood as type "O". The microanalyst also took some reddish brown material from the spare tire in the trunk of Bernstein's car. He found fibrous deposits together with this blood. These deposits were microscopically identified by him as human and animal hair.

Zamb further testified that he was given samples of Bernstein's hair, hair from the Bernstein family's dog and hair from the German shepherd watchdog kept in defendant's plant. These samples were viewed with a stereoscopic microscope to examine their morphological characteristics. He concluded that the animal hairs found in the trunk of

Bernstein's car were morphologically similar to the hair of defendant's dog and that some corresponded to the hair of the Bernstein family's dog. Human hair found in the trunk was identical to that which came from Bernstein's head.

The State called an employee of the Illinois Bell Telephone Company who qualified as an expert in the matter of tracing telephone calls. On April 22, 1972, this witness had received a request from the Federal Bureau of Investigation to trace a call being made from the telephone booth at the gasoline station on 92nd Street and Stony Island Avenue. The number of this telephone is 734-8673. The expert testified that at 11:50 p.m. on April 22, 1972, he completed the entire tracing process which showed that a call had been made from that number to 768-9527 which is a public telephone at 8524 South Stony Island Avenue. The expert stated that his trace had been tested and found accurate.

He was first requested to trace calls coming into the telephone booth at the gasoline station at 7:34 p.m. on the night in question. Three attempts to make such traces were unsuccessful but the last trace which started at 11:38 p.m. was successful. The trace showed simply and only the telephone number from which the call to the Clark station telephone booth had been made.

After defendant was arrested by police and Federal agents on April 23, 1972, he was taken to a conference room where he was questioned by police. There is evidence that he was given proper *Miranda* warnings. Defendant first told the police that he did not know why he had been arrested. They then advised him of information they had regarding his activities on the preceding day. The defendant then admitted that he had participated in the kidnapping of Bernstein but stated that he had been forced to do this at gunpoint by a stranger who had held him up at his cleaning place. About that time Assistant State's Attorney Di Vito entered the room and participated in the questioning. After further discussion defendant gave the police a complete verbal confession.

Defendant stated that he had purchased a cleaning plant from Bernstein in August of 1970. In January of 1971 the plant was almost totally destroyed by fire. Defendant stated that he believed that Bernstein was responsible for this; that lending agencies had refused loans to him because of Bernstein and that the insurance company had refused to pay his claim because of Bernstein's activities. Defendant then conceived the idea of holding Bernstein for ransom so that he could obtain money required to repair the loss. Accordingly, defendant invited Bernstein to his plant at one time but defendant did not consummate the kidnapping. He thought that he needed assistance in the project and obtained the

help of an unnamed person referred to as "Big Man." They agreed upon a division of labor whereby Big Man would hold Bernstein as a prisoner and defendant would obtain the ransom money.

Defendant also stated that Big Man came to the plant before Bernstein. Defendant gave Big Man a .38-caliber pistol from his own holster. When Bernstein arrived defendant again requested a loan from him. When this was refused, Big Man was summoned. He kept Bernstein in defendant's office while defendant went downstairs and moved Bernstein's car to the rear of the cleaning place. After the employees had gone, defendant and Big Man took Bernstein in the latter's car to a place on the south side of Chicago at 115th Street and Vincennes Avenue. Bernstein's car was left there. Big Man took Bernstein away with him into the car of another person. Defendant went back to the cleaning place.

About 9:30 that night, Big Man returned and went with defendant to a telephone booth at 39th Street and the Dan Ryan Expressway where defendant made the initial telephone call to Mrs. Bernstein when a ransom of $100,000 was demanded. Defendant then selected the telephone booth at the Clark gasoline station on 92nd Street and Stony Island Avenue where he would have Mrs. Bernstein wait for his calls. Defendant stated that he himself made all subsequent calls to Mrs. Bernstein.

At about 8:40 p.m. a stenographer was called and the process of reducing the confession to writing began. Police investigators and an Assistant State's Attorney were present. When the written statement was partially completed, defendant's attorney called and at his request the interrogation ceased. Defendant did, however, read, correct, initial the changes and then sign the partially written statement which was read to the jury at trial. Defendant was then admitted to bail.

Two days later he returned to police headquarters with a companion. He told the police officers that he wanted to change part of his statement. He said that another man, a white person, whom he referred to only as "Mike" was involved in the kidnapping together with two black persons and that Big Man was not involved. Defendant stated that he had previously gone to a place near St. Anne, Illinois, with Mike to approve the place where Bernstein was to be held during collection of the ransom. The police and defendant went to the State's Attorney's office and then defendant, two police officers and an Assistant State's Attorney drove out to St. Anne together. They drove to a rural area at directions given by defendant. Defendant pointed out several structures which he said looked like the place where Bernstein was to be kept. Some seven to ten separate premises were searched and nothing was found. Evidence re-

garding this trip was placed in the record by a police officer and by Assistant State's Attorney Chester Slaughter.

Defendant testified at some length. He admitted that Bernstein had been present in the cleaning office on 63rd Street but denied that he had any connection in his disappearance. Defendant admitted that he had owned a 1965 Ford automobile which had been observed extensively by police and Federal agents on the night of April 22 and admitted that he himself had driven the car in the area in question that night. He identified a photograph of his car with the broken taillight. He admitted that he had used two telephone booths on 87th Street that night but stated that the purpose of these calls was merely to communicate with his wife. He accounted for his presence in the area in question but stated in detail the various trips that he had made in the area at that time, all for legitimate and innocent purposes. He kept a German shepherd watchdog in the place on 63rd Street. There had been a fire in the plant but he had no financial problems.

As regards the fact that he wore two holsters, one with a gun and one empty, defendant testified that he had given the gun to a police officer who had stopped him for a traffic violation and then noticed the gun by accident. He stated that the officer was attempting to obtain money from him because he had found the gun in defendant's possession.

As regards defendant's oral and written confessions, he stated that they were not true but that he had signed the statement in order to be able to leave the police station with the thought that he would later straighten the matter out in court. He testified that the police promised to release him on bond provided that they were satisfied with his statement. He did not recall ever having been given warnings regarding his constitutional rights and that certain officers had threatened to take him "to the basement" but they were kept out of the conference room.

When his written confession was exhibited to him, he testified first that he had never seen the document before trial, then he stated that he had actually seen it but only after having spent four months in jail. He also testified that he did see the document on the day it was prepared but that he did not read it. He admitted that it bore his signature and initials at various corrections but said that he did this because he thought he was signing a search permit. He also testified that he wrote his initials on the confession at the request of the police.

Defendant admitted that he had gone voluntarily to police headquarters on April 25, 1972, but said he did so only to obtain his driver's license and other property. He said that he did take a ride with the officers but that they went along at their own suggestion. He did not

give them any directions on the trip and he did point to certain buildings but without any reason. He testified that he did not see a tape recorder or microphone when he made the trip in the car with the police and the Assistant State's Attorney. In rebuttal, the State played before the jury the tape recording which had been made by defendant and the police officers at the time of the trip to St. Anne.

With the facts fresh in mind, we will first consider the issues raised by defendant regarding sufficiency of the evidence to prove guilt beyond a reasonable doubt. Defendant advances a number of arguments. We need not treat each of these contentions in order as we believe that the substance thereof as well as their collective refutation will appear from the following. This appeal demonstrates that there is rarely a case in which the testimony of a number of witnesses as to an involved factual situation may not be the object of attack and criticism originating in the fertile minds of able counsel.

The testimony of Mrs. Bernstein establishes that her husband went to the defendant's cleaning plant sometime on Friday, April 21, 1972. The testimony of Lena Breeland and Claude Fields, employees of defendant, corroborates this. Mrs. Bernstein testified that she received a telephone call that night during which she heard her husband's voice in the background. She testified to repeated telephone calls during the ransom negotiations. In her opinion, during each of these calls she spoke to one of the two black males with whom she had her first telephone contact. It is true that Mrs. Bernstein did not state that the calls she received were from the defendant. However, the issue here is not the sufficiency of each separate item of evidence standing by itself to establish guilt, but the sufficiency of all of the evidence and circumstances considered together. As has already been shown, the step-by-step negotiations on the telephone by Mrs. Bernstein are massively corroborated by the surveillance of numerous Federal agents and Chicago police by visual means and electronic monitoring of her own statements. The placing of the ransom money in the alley by Mrs. Bernstein and her later withdrawal of the money are both similarly corroborated.

In addition, the testimony of Federal agents and police shows definitely that defendant was in the area that night driving his automobile and, by a series of convincing details and circumstances, demonstrates that defendant was actually the person who conducted these telephone negotiations with Mrs. Bernstein.

Furthermore there is physical and scientific evidence which cannot be explained by any reasonable hypothesis other than defendant's guilt as charged. The evidence shows that human blood of the same type as Bernstein's was found in the trunk of his car. Human hair identified as

his was found in the same place. Also, the hairs from a dog which were morphologically similar to the hair of defendant's watchdog were found in the trunk. Defendant attacks this evidence by citing a learned article from The Journal of Criminal Law and Criminology taking the position that there are variations between the hair of human beings and of dogs which make conclusive identification of such hair impossible.

■■ In *People v. Mackins*, 17 Ill.App.3d 24, 308 N.E.2d 92, *cert. denied*, 419 U.S. 1111, this court had occasion to consider the testimony of the same expert witness concerning identification of various fibers from clothing in accordance wih morphological characteristics. We concluded that this type of evidence was proper and that the acceptance or rejection of the opinions of the experts called by the State and the defendant was a matter within the province of the jury. (17 Ill.App.3d 24, 38.) We will apply the same reasoning to the case at bar. *People v. Hill*, 64 Ill.App.2d 185, 212 N.E.2d 259, cited by defendant, is not applicable here. It involves admissibility of results of a lie detector test. The matter of contrary scientific opinion which defendant seeks now to insert into this record should have been brought before the jury by defendant at the time of trial. In our opinion, the scientific evidence in the case before us is another of many links in the chain of evidence which prove guilt beyond reasonable doubt. The same comments apply to the technical evidence of the telephone trace. From all of this evidence the jury was amply justified in concluding that defendant made the various calls to Mrs. Bernstein in demanding ransom.

■■ Defendant urges that the testimony of the Federal agents and Chicago police regarding surveillance is conflicting and therefore ineffective. To illustrate the scope and depth of the arguments presented to this court on this subject, the State has favored us with a seven-page chronological statement of the surveillance and defendant has countered with a corrected appendix of equal length. It is true that there are discrepancies or differences which arguably appear from a comparison of these two masses of material. However, from our examination of the record we are strongly convinced that defendant's criticism attacks immaterial details and that under any reasonable standard the surveillance evidence is most cogent and convincing proof of guilt of defendant as charged.

■■ Defendant's own confession is the final stone which caps the edifice of guilt. Defendant made a complete oral confession to the police and to an Assistant State's Attorney after proper legal warnings and without evidence of coercion or other fact which would affect the voluntary nature of what he said. He signed and initialled his partially written statement although he attempted to evade this fact in his own testimony. Later he came voluntarily to the police station and added to the proof

of his own guilt. These statements given by defendant are a definite and complete portrayal of his guilt.

Defendant's own testimony failed to overcome the massive evidence of guilt. He admitted various matters including the presence of Bernstein at the cleaning place, his ownership of the Ford car with the broken taillight, his presence in the area of the ransom negotiations, his use of two of the described telephone booths and even his ownership of the watchdog. He attempted to counter this evidence by stating in detail the innocent purposes which brought him to the designated area on the night in question.

■■ In addition, he attempted to attack his various confessions by testimony that a police officer took his missing gun, by stating various threats made to him by the police; by testimony that he did not see Assistant State's Attorney Di Vito that night; by denial that he had signed and initialled or had ever seen the written confession, and then making a contrary statement, and by various denials of his voluntary return to the police station and his making of the tape on the automobile trip to St. Anne. Defendant urges that the fact that he made these varying statements to the police and supplied additional contradictions by his testimony serves to deprive all of his various confessions of credibility. This constitutes a dangerous argument since the inconsistencies may also be construed as demonstrations of defendant's lack of veracity. *People v. Lewellen*, 43 Ill.2d 74, 250 N.E.2d 651, cited by defendant, involves a totally different situation. There, the defendant made inconsistent statements but her testimony was corroborated by physical evidence.

■■ Since this case involves considerable circumstantial evidence, it is essential to review the attributes of this type of proof. The law makes "no legal distinction between direct and circumstantial evidence as to the weight and effect thereof." (*People v. Robinson*, 14 Ill.2d 325, 331, 153 N.E.2d 65, and cases therein cited.) Although it has been stated that where the evidence is all circumstantial "the guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis" (*People v. Lewellen*, 43 Ill.2d 74, 78, 250 N.E.2d 651), it does not follow that in a purely circumstantial case the prosecution is required to prove guilt "beyond any possibility of a doubt." (*People v. Murdock*, 48 Ill.2d 362, 367, 368, 270 N.E.2d 21, *cert. denied*, 404 U.S. 957.) The reviewing courts of Illinois have repeatedly held that even where the evidence of guilt is entirely circumstantial, it is "necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else

committed the crime." *People v. Marino,* 44 Ill.2d 562, 580, 256 N.E.2d 770, and cases therein cited.

We are thoroughly convinced that all of the efforts of defense counsel in the case before us result only in raising issues of credibility. Determination of these issues is peculiarly within the province of the jury. In this case, as in so many other cases reviewed by the courts of Illinois, "[t]he determination of the jury will not be disturbed unless the evidence is so unsatisfactory as to justify a reasonable doubt of guilt." (*People v. Benedik,* 56 Ill.2d 306, 310, 307 N.E.2d 382.) In our opinion, no reasonable doubt exists as to the guilt of this defendant of both offenses.

We will next consider defendant's attacks upon the legality of his arrest and subsequent confessions to the police. On July 14, 1972, defendant filed a written motion to suppress his confession. (Ill. Rev. Stat. 1973, ch. 38, par. 114—11.) The theory of this motion was that no lawyer was provided for him during his interrogation by police after arrest and that his confessions and statements, written or oral, "were obtained as a direct result or as an indirect result of both physical and mental coercion and were therefore involuntary as a matter of law." After a hearing, this motion was denied on August 24, 1972. No point is made in defendant's brief on this ruling.

Trial commenced on June 18, 1973, with the selection of the jury. After the jury had been chosen and sworn, on June 20, 1973, defendant filed his petition to quash his arrest and to suppress evidence. (Ill. Rev. Stat. 1973, ch. 38, par. 114—12. )This petition alleged that defendant was arrested without reasonable grounds for believing that he had committed any offense and the police intended to use a revolver and certain statements in evidence against him. The petition alleged that his search without a warrant was illegal as was the taking of the statements and that the contents of such statements were inadmissible due to unlawful detention. The court heard the evidence on this motion immediately before hearing the case in chief. The motion was then denied.

At this hearing, defendant testified that he was arrested by police officers on April 23, 1972, while he was driving his automobile in the vicinity of 22nd and State Streets in Chicago. At that time defendant had not committed any traffic or other offense and police did not show him a warrant for his arrest. The State cross-examined the defendant at some length. These questions were directed in great part to his activities on the previous day, Saturday, April 22, 1972. The examination brought out that at the time of the arrest defendant was driving the same automobile that he had used when he was under police surveillance during the evening hours of the preceding day.

The State called no witnesses but offered in evidence a complaint for search warrant signed by investigator Earl Batch of the Chicago Police Department and sworn to by him before a judge of the circuit court of Cook County on April 23, 1972, at 4:55 p.m., together with a search warrant issued at the same time, both duly filed in the office of the clerk of the circuit court of Cook County. Defendant objected to the search warrant on the grounds that it was sworn to before the court several hours subsequent to the arrest of the defendant and thus could not show probable cause for his arrest and there was no proper foundation for introduction of the original complaint and warrant. These objections were overruled and the complaint and warrant were received. No other evidence was offered on the motion.

■■ The complaint for search warrant sets out with detailed particularity a description of the person of Allen Bernstein, of his clothing and even of the contents of his pockets. The affiant avers that he had probable cause to believe that these listed items were located upon the person of the defendant. Affiant states in detail information that he had received from his own investigation and observations, from his personal interviews of other Chicago police officers and agents of the Federal Bureau of Investigation and from the review of various records and police reports. The complaint sets forth the date and hour upon which Bernstein left his home. The complaint then details much of the evidence above set forth with reference to the telephone calls received by Mrs. Bernstein, her various activities in connection with calls from telephone booths, the handling of currency on the night of April 22, 1972, and a statement of the surveillance by police and Federal investigators concerning the movements of the defendant on that night. The complaint also sets forth the discovery of Bernstein's automobile by the police together with other pertinent facts. The complaint finally states that for these reasons the affiant had probable cause to believe that Bernstein was kidnapped for ransom by defendant so that Bernstein or some of his clothing or personal effects might be found in the defendant's home.

■■ We are of the opinion that the complaint and warrant were sufficiently authenticated to justify their admission in evidence. The trial was held in the criminal branch of the unified circuit court of Cook County. The complaint was filed and the warrant issued in a branch of the same court. Therefore, we find here no failure of authentication. Offering the complaint and warrant "in evidence in effect merely directed the attention of the court to its own records in another case." *People v. Dye*, 23 Ill.App.3d 453, 456, 319 N.E.2d 102.

When the complaint and warrant were offered in evidence, no objection was made by defendant upon the specific ground of hearsay. On

the contrary, other specific grounds were stated such as lack of authentication of the documents. "An objection to evidence based upon a specified ground waives all grounds not specified [citation] and a ground of objection not presented in the trial court, as was the case here, will not be considered on review." (*People v. Canaday,* 49 Ill.2d 416, 423-24, 275 N.E.2d 356.) Defendant's argument in this court that the complaint and warrant were incompetent hearsay is therefore waived.

■■ Defendant urges that the burden of proof of probable cause shifted to the State because of his testimony that he was not violating any law when arrested. This is not precisely correct. The burden of proof rested upon defendant and did not shift. In *People v. Riszowski,* 22 Ill.App.3d 741, 746, 318 N.E.2d 10, this court pointed out that defendant's evidence on his motion made a prima facie case that the police lacked probable cause and thereupon the burden of going forward shifted to the State to negate that evidence at the hearing. In the case at bar, defendant's evidence established a prima facie case for lack of probable cause for his arrest. The burden of going forward on this issue then shifted to the State. Note the same conclusion reached in the recent case of *People v. Glanton,* 33 Ill.App.3d 124, 338 N.E.2d 3, which considers *People v. Moncrief,* 131 Ill.App.2d 770, 268 N.E.2d 717, cited by defendant here. In our opinion, we need not decide whether the evidence brought into the record by the State, consisting of the sworn complaint and the warrant, was sufficient to overcome the prima facie case made by defendant. The ultimate burden of proof on the factual issue of existence of probable cause to arrest rested on defendant.

■■ There is substantial authority in Illinois for the principle that additional testimony at the trial received after conclusion of the hearing on defendant's pretrial motion to suppress may be considered in passing upon the ruling by the trial court upon the motion. (See *People v. Braden,* 34 Ill.2d 516, 520, 216 N.E.2d 808.) In *Braden,* the court pointed out that the ruling on a motion to suppress is not final and may be changed or reversed at any time. The court then held (34 Ill.2d 516, 520):

> "We conclude that since the evidence at the trial established the legality of the arrest and the search in this case, defendant cannot avail himself of any error on the motion to suppress."

*Braden* was cited by this court in *People v. Eastin,* 8 Ill.App.3d 512, 517, 289 N.E.2d 763. Similarly in *People v. Glanton,* this court cited *Braden* and commented upon the inapplicability of *People v. Cassell,* 101 Ill.App.2d 279, 283, 243 N.E.2d 363, upon which defendant here relies. Examination of all of the evidence in the record in the case before us shows that there was, in fact, strong and ample probable cause for

arrest of the defendant. The evidence shows a conscientious and thorough investigation by police and Federal agents and surveillance of the activities of the defendant all prior to the time of the actual arrest. In our opinion, this additional evidence may properly be used to establish the legality of the arrest and of the statements and confessions made to the police by defendant thereafter.

There is yet another independent and legally sufficient constitutional basis for affirmance of the order of the trial court denying the motion to suppress. Let us assume, *arguendo,* that the defendant sustained his burden and proved a lack of probable cause for his arrest. In *Brown v. Illinois,* 422 U.S. 590, 45 L.Ed.2d 416, 95 S.Ct. 2254, the Supreme Court held that the question as to whether a confession is the product of a free will or branded with the taint of unconstitutional arrest "must be answered on the facts of each case. No single fact is dispositive." (422 U.S. 590, 603, 45 L.Ed.2d 416, 427, 95 S.Ct. 2254, 2261.) The Court then set forth the important factors to be considered in arriving at the proper result:

1. The *Miranda* warnings constitute an important factor. Since the warnings were given in the case before us, they have significance in determining validity of the confession.

2. The amount of time which elapsed between the arrest itself and the giving of the confession is important. Defendant here was arrested at 1:15 p.m. As shown above, the taking of the written statement commenced at 8:40 p.m. that day. Defendant's substantially similar oral statement was made some time before to the police and also to an Assistant State's Attorney.

3. The presence of intervening circumstances such as in *Johnson v. Louisiana,* 406 U.S. 356, 365, 32 L.Ed.2d 152, 92 S.Ct. 1620, where, at the time of the challenged lineup, defendant's detention was pursuant to the lawful authority of a magistrate. The fact that defendant voluntarily returned to the police station several days after his admission to bail for further discussion with the police has significance here.

4. Perhaps the most important factor is "the purpose and flagrancy of the official misconduct * * *." (422 U.S. 590, 604, 45 L.Ed.2d 416, 427, 95 S.Ct. 2254, 2262.) The Supreme Court in *Brown* pointed out that the trial record was of importance in making this determination. The Court then examined the entire record and concluded from all of the evidence that a flagrant violation of constitutional rights by the officials was involved.

■■ Examination of the entire record here impels us to the opposite conclusion. We do not have here an investigatory arrest as in *Brown.*

The arrest here was not calculated to cause surprise, fright or confusion. Instead, as shown, the arrest was a proper culmination of a period of intensive investigation and surveillance which led the police most reasonably to believe that criminal offenses had been committed and that defendant was guilty thereof. It appears with a great degree of certainty from the entire record that the confessions made by defendant were untainted by constitutional irregularity. There is no evidence of official misconduct in this record. The State urges that the evidence against defendant, aside from his own confession, was so strong that, assuming the invalidity of the confession, it was harmless error to receive it in evidence. We do not reach and need not decide this issue. In our opinion, applying the test above set forth, formulated in *Brown v. Illinois*, we conclude that the motion to suppress these confessions was properly denied.

As above shown, there was testimony by a Federal agent that defendant had made a call at about 11:35 p.m. from a designated public booth, telephone number 768-9527. This coincided with the testimony of Mrs. Bernstein and other Federal agents that this was the number she had been told to call in connection with the ransom negotiations. To support and corroborate this evidence, the State called an expert from the Illinois Bell Telephone Company. He testified that he had traced calls from the booth at 8524 South Stony Island Avenue, telephone number 768-9527, and that a call was made from that number, at the time in question, to the public booth in the gasoline station at 92nd Street and Stony Island Avenue, telephone number 734-8673.

The expert did not specify the type of equipment used in this procedure other than to state that he had used a "sleeve-holding pad" for the purpose of keeping the circuit on the calling telephone in the open position it had occupied when he had begun to trace. This evidence had no relation to the identity of the caller or the substance of the call but was merely a report of the call having been made. Apparently the tracing of a telephone call, as distinguished from interception of the call or eavesdropping, can be accomplished by technical devices such as a pen register or a TTS176. These devices note "only the existence (including the time of a call and the number dialed) of telephonic communications" (*United States v. Clegg* (5th Cir. 1975), 509 F.2d 605, 610), but disclose no part of the content of the call.

Defendant urges that this evidence was incompetent because it was a violation of the Federal law commonly known as the Anti-Wire Tapping Act (47 U.S.C. § 605.) This Act was first adopted in June of 1934. It was subsequently amended in June of 1968, on the same date that Congress passed an extensive revision of Title 18 of the United States Code

dealing with crimes and criminal procedure. Chapter 119 of Title 18, as thus amended, deals with wire interception and interception of oral communications. 18 U.S.C. § 2510 and following.

Defendant relies principally upon *Commonwealth v. Coviello* (Mass. 1973), 291 N.E.2d 416. *Coviello* held that section 2510 of Title 18 of Federal law does not apply to use of the pen register because it is applicable only to interception of communications which it defines as aural acquisition of the contents thereof. The *Coviello* court held, however, as defendant contends, that the results of the use of a pen register device on a defendant's telephone were inadmissible, where the device was placed without a warrant or other court order, because of interpretation by the court of the Anti-Wire Tapping Act (47 U.S.C. § 605.) Examination of the authorities cited by the State and other cases leads us to the opposite conclusion.

In *United States v. Focarile* (D.C. Md. 1972), 340 F.Supp. 1033, decided after *Coviello*, the court held that use of the pen register without previous court approval was not forbidden by chapter 119 of Title 18 (sometimes referred to as The Omnibus Crime Control and Safe Streets Act of 1968). The court also concluded that Congress intended by this statute to protect only the privacy of the communication. Therefore the statute did not forbid the pen register because use of that device did not constitute aural interception of the contents of the communication as "interception" is defined in section 2510(4) of Title 18. The court therefore rejected the defense argument that the information obtained by the use of the pen register should have been suppressed because of that statute. 340 F.Supp. 1033, 1038, 1039.

In *Korman v. United States* (7th Cir. 1973), 486 F.2d 926, *rev'd on other grounds*, 406 U.S. 952, the court made the following comment (486 F.2d 926, 931):

"But, as conceded by the appellants on appeal, recent precedent indicates that the pen register is not an interception of communication under 18 U.S.C. § 2510(4). United States v. Lanza, 341 F. Supp. 405, 421 (M.D. Fla. 1972); United States v. King, 335 F. Supp. 523 (S.D. Cal. 1971); United States v. Vega, 52 F.R.D. 503 (E.D. N.Y. 1971); United States v. Escandar, 319 F.Supp. 295 (S.D. Fla. 1970.)"

The court also held that the 1968 amendments to the Anti-Wire Tapping Act (47 U.S.C. § 605) implemented the "clear intent of Congress" that the interception of wire communications would be governed solely by chapter 119 of Title 18. Thus the court concluded that information obtained by the pen register was competent evidence.

Another recent decision on the subject available to this court is *United*

*States v. Finn* (7th Cir. 1974), 502 F.2d 938. The Court of Appeals there reversed an order of the District Court which suppressed information obtained by the use of a pen register. The issue raised by defendants there was not the applicability of chapter 119 of Title 18 to use of the pen register but the applicability of section 605 of Title 47 as amended, precisely the point raised by defendant in the case before us. In its opinion the court noted specifically "the Congressional intent to permit pen registers." (502 F.2d 938, 942.) The court gave most careful and through consideration to the meaning of the statute as amended and concluded squarely that the proper construction of this statute is to authorize court use of the information received by a pen register. The court cited the following authorities as reaching the same conclusion concerning the statute prior to its amendment in 1968 (502 F.2d 938, 942-43):

> "We are further reinforced by other decisions construing the predecessor statute the same way without adverting to the construction problem. Nardone v. United States, 302 U.S. 379, 380-381, 58 S.Ct. 275, 82 L.Ed.314 (dictum); United States v. Covello, 410 F.2d 536, 542 (2nd Cir. 1969) (implied dictum); Hanna v. United States, 404 F.2d 405, 408 (5th Cir. 1968); Bubis v. United States, 384 F.2d 643, 647 (9th Cir. 1967) (dictum); Brandon v. United States, 382 F.2d 607, 611 (10th Cir. 1967)."

■■ Thus we have decisions by the Federal courts in *Focarile, Korman* and *Finn*, all subsequent to the *Coviello* decision, approving use of pen register information under section 605 of Title 47 prior to its amendment in 1968, and as amended, and also under chapter 119 of Title 18. We elect to follow these decisions rather than the single decision of the Massachusetts Court in *Coviello*. This election is fortified by the statement in *United States v. Clegg* (5th Cir. 1975), 509 F.2d 605, 610, that "The Fourth Amendment, however, protects only the content of a telephone conversation and not the fact that a call was placed or that a particular number was dialed. United States v. Baxter, 492 F.2d 150, 167 (9th Cir. 1973)."

■■ In the ordinary situation, while decision of the Federal courts are entitled to respect, they are not binding upon this court except in cases of estoppel by verdict or res judicata. (*Lewis v. Braun*, 356 Ill. 467, 474, 475, 191 N.E. 56.) However, in the case before us the controversy depends solely upon construction of a Federal statute as regards use of the pen register. We have no such legislation in Illinois. (Compare Ill. Rev. Stat. 1973, ch. 38, par. 14—1 *et seq.*, which pertains only to the hearing or recording of conversation.) Thus, it is our opinion that decisions of the Federal courts in this field should be viewed as highly per-

suasive. Analogously in construction of an Illinois statute, which is modeled after the statute of a sister State, the courts of Illinois place a high degree of credence in the construction of the enactment previously annunciated by the highest courts of that State. (*Cook v. Dove,* 32 Ill.2d 109, 112, 203 N.E.2d 892.) We conclude that the evidence obtained by use of the pen register was properly received in evidence.

Defendant urges error in selection of the jury. The trial court refused to permit counsel for defendant to question prospective jurors on voir dire. The court gave defense counsel an opportunity to submit questions for the prospective jurors to be asked by the court. Counsel submitted a number of questions and the trial court adopted all of them and put these inquiries to every juror. The parties stipulated that individual examination of the prospective jurors by the court should not be transcribed by the court reporter. Therefore, the record does not show any of the questions put to individual jurors or their answers. We cannot consider this contention without the record. Responsibility for proper preservation of the record of proceedings rested upon defendant. *People v. Smith,* 42 Ill.2d 479, 483, 248 N.E.2d 68, cited in *People v. Neal,* 26 Ill.App.3d 22, 26, 324 N.E.2d 476.

■■ In addition, a strong line of cases holds that it is incumbent upon an objecting party to show that refusal of the court to permit direct questioning of prospective jurors by counsel was in some manner prejudicial and precluded the defendant from an intelligent exercise of his rights in selection of an impartial jury. (*People v. Peters,* 33 Ill.App.3d 284, 337 N.E.2d 716; *People v. Green,* 30 Ill.App.3d 1000, 333 N.E.2d 478; *People v. Etten,* 29 Ill.App.3d 842, 331 N.E.2d 270; *People v. McClellan,* 29 Ill.App.3d 712, 331 N.E.2d 292, *leave to appeal denied,* 60 Ill.2d 599; *People v. Turner,* 27 Ill.App.3d 239, 326 N.E.2d 425, and *People v. Carruthers,* 18 Ill.App.3d 255, 309 N.E.2d 659.) Examination of the entire record before us fails to disclose such prejudice.

Defendant urges next the giving of improper instructions to the jury. The indictment charged defendant with aggravated kidnapping in that he secretly confined Allen Bernstein against his will for the purpose of obtaining ransom. (Ill. Rev. Stat. 1973, ch. 38, par. 10—2(a)(1).) Defendant was charged with intimidation in that he communicated a threat to Bernstein's wife to subject her husband to physical confinement or restraint with intent to cause her to pay ransom. Ill. Rev. Stat. 1973, ch. 38, par. 12—6(a)(2).

The given issues instruction on aggravated kidnapping informed the jury that to sustain the charge of aggravated kidnapping the State must prove, *inter alia,* that defendant secretly confined Bernstein against his will or that by force, or threat of imminent force, he carried Bernstein

from one place to another and that when defendant did so he intended secretly to confine Bernstein against his will. Also, the instruction required the State to prove that defendant acted for the purpose of obtaining ransom or money, etc., from Bernstein or any other person or that defendant inflicted great bodily harm upon Bernstein. (People's Instruction No. 14, IPI-Criminal 8.05.) On the charge of intimidation, the court instructed the jury that the State was required to prove, among other elements, that the defendant communicated to Bernstein's wife a threat to inflict physical harm on him or to subject him to physical confinement or restraint. People's Instruction No. 16, IPI-Criminal 11.16.

Defendant contends that both of these instructions are erroneous in that they tended to place him on trial for aggravated kidnapping and intimidation under definitions other than that with which he was charged. ■■ However, the authorities validate these issues instructions in the alternative form in which they were given. It has been held that the Criminal Code of Illinois, when it delimits various alternative elements of the crime in separate subsections, does not define separate and distinct crimes but sets out only a single offense with the various subdivisions dealing with details regarding the commission of that one offense. This point is made in the recent case of *People v. Allen*, 56 Ill.2d 536, 309 N.E.2d 544, *cert. denied*, 419 U.S. 865, which in turn cites *People v. Rosochacki*, 41 Ill.2d 483, 244 N.E.2d 136. In *Allen*, the defendant was indicted on two counts of murder. (Ill. Rev. Stat. 1973, ch. 38, pars. 9—1(a)(1) and 9—1(a)(2).) The jury was instructed on the theory of felony murder. The Supreme Court rejected defendant's contention that the jury was instructed on a crime not charged in the indictment.

The cases relied upon by defendant do not in any manner affect the validity of the *Allen* holding. In both of them the instructions charged the jury upon separate and additional crimes which were not at issue in the trial. *People v. McCauley*, 2 Ill.App.3d 734, 277 N.E.2d 541, involved aggravated battery upon a police officer and the instructions dealt with attempt escape and resisting arrest. In *People v. Stanko*, 402 Ill. 558, 84 N.E.2d 839, defendant was charged with attempt abortion and the erroneous instruction defined and dealt with abortion. In situations such as existed in *Allen* and *Rosochacki* and in the case at bar, the assailed instructions are not erroneous, did not in any manner hamper defendant in presenting his defense, by surprise or otherwise, and raised no possibility of the existence of double jeopardy. (See *Allen*, 56 Ill.2d 536, 542, 543.) As shown elsewhere in this opinion, there was evidence in the record tending to prove each of the alternatives stated in both of the challenged instructions.

Defendant also points out that his counsel tendered, and the trial court

refused, an issues instruction on each of the charges. These instructions were taken from a Manual on Jury Instructions in Federal Criminal Cases, prepared by the Judicial Conference of the 7th Circuit, under the supervision of Honorable Walter J. LaBuy. The rules of the Supreme Court of Illinois provide that Illinois pattern instructions are to be used in criminal cases unless the court determines that any such instruction does not accurately state the law. (Ill. Rev. Stat. 1973, ch. 110A, R. 451 (a).) Consequently, this justified the court in refusing the instructions tendered by defendant. *People v. Dickens*, 19 Ill.App.3d 419, 424, 311 N.E.2d 705.

■■ In the case before us, at the conference on instructions, the only objection made by counsel for defendant to both of the given issues instructions was that they did not state the law. The applicable rule provides that "the grounds of the objections shall be particularly specified." (Rule 451(b).) The general objection made by defendant fails to meet the requirements of this rule. (*Johnston v. Basic*, 16 Ill.App.3d 453, 457, 306 N.E.2d 610, *leave to appeal denied*, 56 Ill.2d 582.) Furthermore, the written motion for new trial filed by defendant raises no point on the instructions. Therefore, even completely aside from the validity of the given instructions, defendant has waived any issue which may exist regarding their propriety. See *People v. Pickett*, 54 Ill.2d 280, 282, 296 N.E.2d 856, and *People v. Hairston*, 46 Ill.2d 348, 367, 263 N.E.2d 840, *cert. denied*, 402 U.S. 972.

Defendant's final contentions concern allegedly prejudicial cross-examination and final argument. In the State's case, it appeared that Assistant State's Attorney Di Vito was present during part of the time that defendant was interrogated by the police. In his direct testimony defendant referred to this interrogation and remembered the names of certain investigators who were present but did not mention Mr. Di Vito. On cross-examination by Mr. Di Vito, he questioned defendant concerning his presence during the questioning. Counsel for defendant then asked the court whether this put the Assistant State's Attorney in the position of being a witness so that he should remove himself from the case. The court stated that removal would not be necessary as long as the State's Attorney did not testify. The cause then proceeded.

■■ In rebuttal, the State called two investigators who were present at the interrogation and both of them testified that Assistant State's Attorney Di Vito was also then present. Aside from the fact that no objection was made to the cross-examination or to the rebuttal evidence, we do not see any prejudice to defendant. No authority is cited in support of defendant's contention. *People v. Vasquez*, 8 Ill.App.3d 679, 291 N.E.

2d 5, and *People v. Bitakis*, 8 Ill.App.3d 103, 289 N.E.2d 256, both involve final argument by the prosecution.

Defendant brings up three instances of allegedly prejudicial oral argument. Defense counsel argued that there was no evidence that the voice of the person who called Mrs. Bernstein concerning the ransom was identical to the voice of defendant although the evidence showed that these conversations had been taped so that the State could have proved similarity if it, in fact, existed. In response, the prosecutor repeated this contention and stated that any tapes of the telephone conversations were not available as evidence "because of legal technicalities." Defendant cites *People v. Gilmer*, 110 Ill.App.2d 73, 249 N.E.2d 129, in which the prosecutor based his remarks upon the absence of a search warrant and the resulting inability of the prosecution to present marked money in evidence. A previous ruling of the court had excluded this evidence pursuant to defendant's motion to suppress. That situation is not comparable to the case before us as no such ruling was made by the court.

Defendant also cites *People v. Fields*, 12 Ill.App.3d 608, 298 N.E.2d 743. The Supreme Court reversed *Fields* and held that the evidence of defendant's guilt was completely persuasive and it appeared that the improper remarks did not constitute a material factor in the conviction. *People v. Fields*, 59 Ill.2d 516, 521, 522, 322 N.E.2d 33.

A complete answer to this argument arises from the fact that the prosecutor was merely exercising his privilege and his duty of responding to the argument previously raised by the defense. The assailed argument was therefore proper and legitimate as a response by the prosecution to the previous argument of defendant. *People v. Reyes*, 131 Ill.App.2d 134, 140, 141, 266 N.E.2d 539.

■■ Defendant complains next that the Assistant State's Attorney made a misstatement to the jury when he stated that defendant's employee, Claude Fields, had not testified that he told his father that he had seen Bernstein leave defendant's premises. The record shows that the prosecutor started his argument by inviting the jury to disregard any of his remarks not justified by the evidence. Then in making the assailed statement, the prosecutor merely expressed his recollection of the evidence and did not purport to make a positive statement.

The final alleged error involves comments by the prosecutor on the fact that Bernstein was still missing at the time of trial. This fact was brought out by the State at the very beginning of the trial when Mrs. Bernstein testified as to the last date upon which she saw her husband and by one other witness. No objection was made to that evidence. It was material and legitimate for the State to establish this fact as justifica-

tion for their failure to call Bernstein as a witness. Consequently, comments by the Assistant State's Attorney on this subject were within the bounds of proper and legitimate argument. The remarks by the State's Attorney were well within the requirement that they be "based upon relevant evidence in the record * * *." (*People v. Wright*, 56 Ill.2d 523, 531, 309 N.E.2d 537.) In *Wright*, a homicide case, the Supreme Court affirmed the conviction although the final argument alluded to intense suffering by the victim and even made reference to the family of the deceased. *People v. Hopkins*, 124 Ill.App.2d 415, 259 N.E.2d 577, cited by defendant, is not applicable here. It involved a strong inference by the prosecutor that defendants failed to take the stand in their own behalf and were engaged in a life of crime as a source of funds.

Referring generally to all three of the points made by defendant concerning allegedly prejudicial argument, no objection was made in any of these instances by counsel for defendant. Even if the remarks were improper, failure to make a timely objection was a waiver of the point. (*People v. Skorusa*, 55 Ill.2d 577, 585, 304 N.E.2d 630, and cases there cited.) The written motion for new trial filed by defendant makes no reference to prosecution argument. This is another complete ground for waiver in accordance with authority cited in another portion of this opinion.

In addition, we cannot say that any of the arguments here complained about, or all of them collectively, constituted "a material factor in the conviction * * *" (*People v. Clark*, 52 Ill.2d 374, 390, 288 N.E.2d 363) or must have resulted in "substantial prejudice to the accused." *People v. Nilsson*, 44 Ill.2d 244, 248, 255 N.E.2d 432, *cert. denied*, 398 U.S. 954.

Having considered every contention made by defendant, we find no error in this record. The judgment appealed from is affirmed.

Judgment affirmed.

BURKE, P. J., and EGAN, J., concur.